ORIGINAL    1599·14

In the

Court of Criminal Appeals

Austin, Texas

Terrence Brent McNeil

Petitioner

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 12 2015

Abel Acosta, Clerk

V

The State of Texas

Respondent

On Appeal from First Court of Appeals Cause Number 01-13-00234-CR

338TH District Court Cause Number 1362563 of Harris County, Texas

Honorable Brock Thomas, Presiding

FILED IN
COURT OF CRIMINAL APPEALS

MAR 13 2015

Abel Acosta, Clerk

Petition for Discretionary Review

No Oral Argument

Terrence Brent McNeil

TDCJ # 1848870

Beto Unit

1391 FM 3328

Tennessee Colony, TX 75880

Identity of Parties and Counsel

Petitioner:

Terrence Brent McNeil
TDCJ# 1848870
Beto Unit
1391 FM 3328
Tennessee Colony, TX 75880

Presiding Judges:

Chief Justice Sherry Radack
Court of Appeals, First District
301 Fannin Street
Houston, TX 77002-2066

Justice Terry Jennings
Court of Appeals, First District
301 Fannin Street
Houston, TX 77002-2066

Justice Evelyn Keyes
Court of Appeals, First District
301 Fannin Street
Houston, TX 77002-2066

ii

# Table of Contents

Identity of Parties and counsel ........................................ ii

Table of Contents .......................................................... iii

Index of Authorities ...................................................... v

Statement of the Case .................................................. vi

Issue Presented .......................................................... vi

## Issue One

Counsel was ineffective for failing to raise key objections to portions of Petitioner's four videotaped statements. The State used the videos as impeachment evidence, and character conformity evidence. The video also contained extensive inadmissable hearsay and opinion testimony from police.

Statement of Procedural History ................................... 1

Argument ...................................................................... 1

Argument - Ground One ................................................ 1

   A. Standard of Review ............................................ 2

   B. Counsel failed to raise critical objections to portions of Mr. McNeil's videotape. ...........................................

     1. Statement 2, 7-19-2011 (3X51)(R.R. Supp.) ........ 2

   C. Mr. McNeil exercised his right to not testify at trial. Due to counsel's failure to object and seek further redactions, however, the state was able to use his videotaped statements as impeachment evidence and evidence of bad character. Therefore, counsel's ineffectiveness was harmful. ........................................ 3

Prayer                    6

Appendix                    Opinion

# Index of Authorities

## Cases

Hughes v State, 4 S.W. 3d 1 (Tex. Crim. App. 1999) ..... 5

Langham v State, 305 S.W. 3d 568 (Tex. Crim. App. 2010) ..... 3

Lesso v State, 295 S.W. 3d 16 (Tex App.-Houston [1st Dist.] 2009, pet. ref'd) ..... 2

Salinas v Texas, 133 S. Ct. 2174 (2013) ..... 3

Strickland v Washington, 466 U.S. 668 (1984) ..... 2, 6

Turner v U.S., 396 U.S. 398 (1970) ..... 3

## Rules

Tex. R. Evid. 403 ..... 5

Tex. R. Evid. 404 (a) ..... 5

## Constitutional Provisions

Tex. Const. Art. I §10 ..... 3, 6

U.S. Const. Amend. V ..... 3, 6

U.S. Const. Amend. VI ..... 6

U.S. Const. Amend. XIV ..... 3, 6

PD-1599-14

| | |
|---|---|
| Terrence McNeil | In the |
| vs | Court of Criminal Appeals |
| State of Texas | Austin, Texas |

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

Come now, Terrence Brent McNeil, Petitioner, Pro se, files this Petition For Discretionary Review pursuant to Rule 6C, Texas Rules of Appellate Procedure.

## Statement of the Case

On May 5, 2014, the Petitioner filed the brief with the First Court of Appeals, base solely on ineffective counsel. How counsel failed to perform his duty as counsel in representing the Petitioner during the Petitioner's trial, before the 338th District Court of Harris County, Texas. Allowing statements made by the Petitioner to be used by the state during closing argument, and the Petitioner did not testify at trial.

## Issue Presented

## Issue One

Counsel was ineffective for failing to raise key objections to portions of Petitioner's four videotaped statements. The state used the videos as impeachment evidence, and character conformity evidence. The video also contained extensive inadmissable hearsay and opinion

vi

testimony from police.

## Procedural History

On March 19, 2013, the trial court entered judgment against Petitioner after jury found him guilty of felony murder and assessed punishment at life. (2 C.R. at 468) Petitioner timely filed notice of appeal on March 19, 2013. Petitioner brief and supplemental brief were filed May 5, 2014. On the 20th day of November, 2014, the First Court of Appeals affirmed trial court's judgment.

## Ground For Review

First Court of Appeals erred on ruling that Counsel was not ineffective for not raising key objections to portions of Petitioner's four videotape statements. The State used the videos as impeachment evidence and character conformity evidence.

## Argument

First Court of Appeals erred on ruling that Counsel was not ineffective for not raising key objections to portions of Petitioner's four videotape statements. The state used the videos as impeachment evidence and character conformity evidence.

"You heard four plus hours of him," one of the prosecutors told jurors during closing argument. "And don't for a second think we played those statements for you because we believe all his claims of accidental injuries..... Not because we believe that at all. Because we wanted you to see who he was. We wanted you to see how self-centered and self-absorbed

1

Terrence McNeil is. Because in every one of those statements, it was all about him...."
(7 R.R. at 129)


A. Standard of Review


When an ineffective assistance claim alleges that counsel was deficient in failing to move to suppress or to object, the petitioner must show that the evidence was inadmissable and that the motion to suppress or the objection would have been granted. Lesso v. State, 295 S.W. 3d 16, 21 (Tex. App. - Houston [1st Dist.] 2009, pet. ref'd). This showing established the first prong of Strickland's two part analysis: that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668 (1984).


B. Counsel failed to raise critical objections to portions of Mr. McNeil's videotape.


1. Statement 2, 7-19-2011 (SX 51)(R.R. Supp.):


A. ...So, me spending a few...
A. Hours with her, you're saying that, all of a sudden, all these problems just came wrong with her?
A. ...Okay, but, you need to understand how I function. I love Anita, and when she has that look... when she's asking me, you know, with tears almost coming out of her eyes, you know, "you think that, uh, her arm was fractured 'cause of how you handled her," I'm like "uh, baby. If... If I did hurt her by how I picked her up, I apologize to you, baby." That's what I said: "If I did hurt her, I apologize to you baby." And that's.....that's the cour.... courteous thing to do. If you hurt somebody by accident, you apologize. So, you... but you're asking me why I would apologize.
A. 'cause I told her if her arm was fractured from how I picked her up that one time [motioning with fists], I apologize for picking her up that way. That's all I was saying (p.11 at 26:29)


2

A. Well, I'm looking at is, I'm a black male and a baby was hurt and she died. And its... and I... I'm not playing no race card, I'm just playing the reality card... It's white detectives, white doctors, looking at a black male, who, at the time, had no job, and they're just looking for somebody to hang for the baby being hurt and dying. (p. 29 at 1:24:46)

A. Well she never threw up.

A. No. She spit up when I gave her CPR. She never threw up.

A reviewing court is required to look beyond the state's mere assertion that statements are "contextual" and determine whether, in fact, the statements the state seeks to offer are testimonial, and harmful to the defendant. See Langham v State, 305 s.w. 3d 568, 574 (Tex. Crim App. 2010) Counsel was ineffective for failing to challenge the state's bald assertion. This additional ineffectiveness was not harmless beyond a reasonable doubt. In fact, it most likely was extremely harmful, given the hours of court time devoted to playing the videos for jury.

C. Mr. McNeil exercised his right to not testify at trial. Due to counsel's failure to object and seek further redactions, however, the State was able to use his videotaped statements as impeachment evidence and evidence of bad character. Therefore, counsel's ineffectiveness was harmful.

A criminal defendant has an absolute right to not testify. U.S. Const Amend. V, XIV; Tex. Const. Art. 1 §10. Because a defendant's reasons for remaining silent at trial are irrelevant to this constitutional right, he need not expressly invoke that privilege. Further, a showing by the state that the testimony would not be self-incriminating would not overcome the absolute privilege. See Salinas v Texas, 133 s. Ct 2174, 2179 (2013), citing Turner v U.S., 396 U.S. 398, 433 (1970) (Black, J., dissenting).

3

Mr. McNeil chose not to testify during the guilt/innocence stage of trial (7 R.R. at 94). Nevertheless, the jury heard him and watched him being questioned by police for more than four hours. Much of the State's use of Mr. McNeil's statements was akin to calling a witness for the purpose of impeaching him with evidence of bad character. That was the State's recurring theme during the trial. During opening statements, one prosecutor said:

You are going to hear from the defendant's mouth, three, arguably four, different statements with three different officers. And while you are watching five hours in total of what the defendant says happened, when you watch the defendant for about five hours trying to explain himself, when you watch the defendant give every different version but the truth, watch for a tear. Look for a tear, one tear that is dropped.....

He's interviewed that night. He's interviewed months later when he's arrested by two different officers. He's going to give explanations which are not true.... (4 R.R. at 14). Counsel objected: "This is not necessarily opening argument, more of final arguments." (4 R.R. at 15). Then he did not bother to make an opening statement on McNeil's behalf.

Then, during closing arguments, both prosecutors reiterated this theme. In addition to the argument quoted in the introduction to Issue Two above, prosecutors also argued:

• "Who has a child die in their arms—his words—who has a child die in their arms and act like he did? That's why we played those statements for you: So you could see who he is and so you could hear his lies...." (7 R.R. at 130).

• "That's why we played those statements for you: So that you could see what a self-absorbed self-centered liar he is, so that you would know from those words and from what you heard, from all the evidence, what he did to that child, that he murdered her." (7 R.R. at 131).

2

• "Did you notice in four and a half hours, all he's worries [sic] about is how Anita is going to react to what he has done? Right? (7 R.R. at 150).

A party may not call a witness for the primary purpose of obtaining impeachment evidence. See Hughes v State, 4 S.W. 3d 1 (Tex. Crim. App. 1999):

> The lack of favorable testimony suggests the state was attempting to use [the witness] prior inconsistent statements under the guise of impeachment for the primary purpose of placing before the jury evidence which was not otherwise admissable. ... Due to the highly prejudicial nature of this evidence we conclude any probative value it may have had was substantially outweighed by it's prejudicial effect. We hold the Court of Appeals erred in failing to find the trial court abused its discretion under Rule 403 when it permitted the state to admit evidence of [the witness] prior inconsistent statements to impeach her testimony. Hughes, 4 S.W 3d at 7. Yet this is exactly how the state used Mr. McNeil's statements. In effect, the state was asking the jury to find Mr. McNeil guilty of murder because of his alleged character as an insensitive liar.

Character evidence is not admissable for the purpose of proving that a person acted in conformity with it on a particular occasion. Tex. R. Evid. 404(a). Even if it were, the state's character evidence in this case purported to show that Mr. McNeil was a liar and insensitive, neither of which tends to prove that he also is a murderer. Counsel was ineffective because he failed to object to the content of statements that were not probative of elements of the offense and not strictly contextual. This allowed the state to place him on trial for bad character, in effect impeaching him through his statements even though he exercised his right to not testify at trial.

5

The issue above is sufficient to require reversal of Mr. McNeil's murder conviction due to the violation of his right to effective assistance of counsel under United States Const. Amends. V, VI, and XIV, and under Tex. Const. Art. 1 §10. However, when viewed together, they demonstrate conclusively that counsel's overall performance was deficient.

Further, there is a reasonable probability that the result of this trial would have been different but for the errors made by counsel. If the jury had properly been instructed on the use of extraneous offense evidence, if the state had not been given virtual free reign to use Mr. McNeil's statements for any and all purposes, then this would have been a reasonable doubt case. There is a reasonable probability that the 12 jurors would have found him not guilty, or at least would have been unable to agree unanimously that he was guilty. After all, it only takes one juror with a reasonable doubt to prevent a conviction, and it took even the police 10 months to settle on Mr. McNeil, rather than Ms. Washington, as the alleged murderer. Alternatively, but for these errors, it is highly unlikely that Mr. McNeil, who had no prior felony record, would have received a life sentence. His conviction should be reversed. See Strickland v Washington, 466 U.S. 668 (1984)

Prayer

Mr. McNeil respectfully request this court to review the records and Reporter Record, plus Supplemented Record and reverse his conviction and remand this case for a new trial.

6

Respectfully Submitted,

Terrence McNeil

Terrence McNeil

TDCJ # 1848870

Beto Unit

1391 FM 3328

Tennessee Colony, TX 75880

Opinion issued November 20, 2014



In The

# Court of Appeals

For The

## First District of Texas

———————————

NO. 01-13-00234-CR

———————————

**TERRENCE BRENT MCNEIL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

———————————————————————————————————————

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1362563**

———————————————————————————————————————

## OPINION

A jury convicted appellant Terrence McNeil of felony murder for causing the death of a child in the course of committing the offense of injury to a child and assessed his punishment as life in prison. On direct appeal, appellant argues that he received ineffective assistance from his trial counsel. We affirm.

# TRIAL TESTIMONY

Anita Washington's 19-month old daughter Alycia was small for her age because she suffered from a congenital heart-defect condition. When she was about a year old, Alycia underwent two successful open-heart surgeries to correct the defects in her heart. Despite her health issues, Alycia recovered from her surgeries and functioned as a normal and otherwise healthy toddler, but with some developmental delays.

Beginning in July 2010, when Alycia was about 17-months old, Anita hired Ruby Cantu to take care of Alycia at Cantu's home while Anita was at work. By early September of that year, Cantu began to notice bruises on Alycia's legs, head, chest, stomach, and arm. At one point, Anita admitted to Cantu that she had spanked Alycia and caused a bruise on her thigh. When Cantu told Anita that she would not be able to keep Alycia one day, Anita told her that was okay because Anita's live-in boyfriend, appellant, wanted to do a "baby boot camp on her" because Alycia rolls her eyes and "gets an attitude." Cantu testified that, on September 8, 2010, Alycia had a bruise down the side of her head and a fractured arm. On September 11, 2010, Cantu noticed red dots in Alycia's eyes. Cantu did not believe Anita's excuses about Alycia's injuries. Suspecting abuse, Cantu took pictures of Alycia's injuries, notified CPS, and told Anita that she would no longer keep Alycia.

2

Appellant then agreed to care for Alycia while Anita was at work. After walking Anita to the bus stop on the morning of September 14, 2010, appellant returned to the apartment with Alycia. According to appellant, Alycia—who had just recently begun to walk—fell and hit her head on a toy piano in the apartment. Appellant later admitted to also having dropped Alycia that morning, causing her to hit her head on the wall. Appellant soon noticed that Alycia was slouching and having trouble breathing.

At Anita's suggestion, appellant called his friend David to drive them to a hospital. Appellant explained to David that, because Alycia held her breath when he tried to feed her, he had "popped" her on the stomach, causing her to flail back and hit her head. After she started crying, appellant said that he tried to feed her again, and again she fell back, again hitting her head. At that point she stopped crying, causing appellant to be alarmed and eventually call David. By the time David and appellant arrived at West Houston Hospital, Alycia was no longer breathing. She was life-flighted to Texas Children's Hospital.

The staff at West Houston Medical Center and Texas Children's Hospital found Alycia unresponsive and noticed bruises on her body. Although Alycia was officially pronounced dead on the morning of September 15, she had already been brain dead for some time. Dr. Lopez reviewed Alycia's prior medical records and performed her autopsy. Apart from the various injuries Alycia had suffered over

3

the course of the past month and her small size due to her chromosomal abnormality, he testified that she appeared to be "functioning normally and was otherwise healthy."

Lopez identified bruises on Alycia's head and scalp. There were also bruises on her abdomen, legs, and the arm that was fractured a week before. Internally, Alycia had hemorrhages in her abdomen, internal organs, head, arm, and eyes. She also had a detached retina. Many of the hemorrhages, including those on Alycia's head and abdomen, were acute, meaning that they had occurred within 48 hours of the autopsy, and these hemorrhages were the cause of death. The hemorrhages on Alycia's head and abdomen were consistent with being caused by severe blunt force trauma, and Lopez determined that the manner of death was homicide. Dr. Love, a forensic anthropologist, also performed a pediatric skeletal exam and determined that there had been trauma to Alycia's ribs and her broken arm.

### A. Appellant's Videotaped Statements

Anita, David, and appellant all voluntarily went from the Texas Children's Hospital to the police station for interviews with homicide detectives. On that day, appellant gave Sergeant Torres a videotaped statement. After his arrest ten months later, appellant gave additional videotaped statements: one to Detective Johnson

4

and two to Sergeant Chandler. Appellant's four videotaped statements to officers totaled about five hours.

At a pretrial hearing, the State and defense counsel agreed to several redactions to the videotaped statements to remove references to appellant's polygraph examination and some comments about race. Defense counsel conceded appellant made all four statements voluntarily and with appropriate warnings. Counsel argued, however, that a few of the statements and questions by officers on the tapes were improper because they cast doubt on appellant's credibility, expressed the officers' opinions on the strength of the State's case, and suggested to the jury that there was additional evidence that the jury was not hearing implicating appellant. The court overruled those objections.

During the guilt/innocence phase of trial, Sergeants Chandler and Torres and Detective Johnston testified about the making of the tapes and the police investigation. Appellant did not testify, but his videotaped statements were played before the jury without additional objection from his counsel.

The jury found appellant guilty of felony murder and assessed a sentence of life imprisonment.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In three points of error, appellant contends that his trial counsel was ineffective because, during the guilt/innocence phase, counsel: (1) failed to request

5

a burden-of-proof instruction and limiting instruction on extraneous offenses; (2) failed to raise key objections to portions of appellant's videotaped statements; and (3) provided such deficient representation that, which viewed in its totality, caused the trial's result to be unreliable.

## A. Standard of Review and Applicable Law

We consider claims of ineffective assistance of counsel under the two-prong test adopted in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail on an ineffective assistance of counsel claim, appellant must show that (1) counsel's performance was deficient, meaning it fell below an objective standard of reasonableness, and (2) the deficiency prejudiced the defendant, meaning there was a reasonable probability that, but for the counsel's deficient performance, the results of the trial would have been different. *Id.*; *Ex parte Napper*, 322 S.W.3d 202, 246, 248 (Tex. Crim. App. 2010). The burden is on appellant to prove by a preponderance of the evidence that counsel was ineffective. *See McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996).

The first prong of *Strickland* requires that the challenged acts or omissions of counsel fall below the objective standard of professional competence under prevailing professional norms. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010). Appellate courts are highly deferential to trial counsel and avoid evaluating counsel's conduct in hindsight. *Ingham v. State*, 679 S.W.2d 503, 509

(Tex. Crim. App. 1984). Thus, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

The second prong of *Strickland* requires a reasonable probability that the outcome of the case would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome, meaning that counsel's errors must be so serious that they deprive appellant of a fair trial. *Smith v. State*, 286 S.W.3d 333, 340–41 (Tex. Crim. App. 2009).

Allegations of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the ineffectiveness. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). "In the rare case in which trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). When the record is silent as to the reasoning behind an alleged deficiency by trial counsel, "we will assume that counsel had a strategy if any reasonable sound strategic motivation can be imagined." *Id. See also Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) ("[I]n the absence of evidence of counsel's reasons for the challenged conduct, an appellate court . . . will not

conclude the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it.").

## B. Jury Charge Instructions

In his first issue, appellant argues that defense counsel was ineffective because he failed to request that a burden-of-proof instruction and a limiting instruction about extraneous offenses be included in the jury charge. Specifically, he contends that the court should have instructed the jury during the guilt/innocence phase that (1) it could not consider evidence of extraneous offenses unless the offenses were proven beyond a reasonable doubt (burden-of-proof instruction), and that evidence of extraneous offenses could only be used for limited purposes, and not as evidence of appellant's character (limiting instruction).

Following the jury's guilty verdict—and during a discussion with the court about the punishment-phase jury charge—the court asked appellant's counsel whether he wanted extraneous-offense instructions in the jury charge for the penalty phase. Counsel responded that, as in the guilt/innocence phase, he wished to exclude any extraneous-offense instructions in the penalty phase. He explained his reasoning during the following exchange:

> The Court: There's been, with regard to the guilt/innocent stage of trial, specifically, [defense counsel], you have requested that there not be an extraneous instruction at that phase, and it's my understanding

8

that you are asking that that instruction also be removed from the Court's Charge [for the penalty phase].

Defense Counsel: That is correct.

The State: Judge, we just want to make sure that the record is clear. We think out of an abundance of caution the extraneous charge should be in there given all the other injuries attributed to this child that are not necessarily date specific and attributed to the defendant. So we want the record to be clear that it is his trial strategy to not have it in there because he believes it's going to draw more attention to it. Because I think the more cautious thing would be for it to be in the Charge. So we need the record to reflect that.

Defense Counsel: It is my decision, based on the fact, I do not want any further attention attracted to any other injuries or any other possible misconduct that I wish to have the extraneous charge removed or not included.

The Court: Okay. Based upon that request then, the Court will remove it based upon [defense counsel's] stated reasons and request.

A criminal defendant is "entitled to be tried on the accusations made in the State's pleading and he should not be tried for some collateral crime or for being a criminal generally." *Wilkerson v. State*, 736 S.W.2d 656, 659 (Tex. Crim. App. 1987). Thus, evidence of other crimes, wrongs, or acts is not admissible to prove the character of the defendant, but may be admissible for other legitimate purposes. TEX. R. EVID. 404(b). "The general standard or test for the admission of an extraneous offense is whether the prosecution can show (1) that the offense or transaction is relevant to a material issue in the case, and (2) that the probative

9

value of the evidence to the trier of fact outweighs its prejudicial or inflammatory nature." *Wilkerson*, 736 S.W.2d at 659.

If evidence has only been admitted for a specific purpose, then the trial court must—upon request—include a limiting instruction that the jury may only consider the evidence within its proper scope. TEX. R. EVID. 105(a). When requested, the court must also include an instruction not to consider evidence admitted for a limited purpose unless the jury finds beyond a reasonable doubt that the defendant committed the extraneous offenses. *George v. State*, 890 S.W.2d 73, 76 (Tex. Crim. App. 1994).

Appellant relies primarily on the Court of Criminal Appeals' opinion in *Ex parte Varelas*, 45 S.W.3d 627 (Tex. Crim. App. 2001) (orig. proceeding) in contending that his counsel provided ineffective assistance in failing to request jury instructions about extraneous offenses. Similarly to this case, the State's murder case against the defendant in *Varelas* was built on evidence of physical abuse that his murdered stepdaughter sustained over the six weeks leading up to her death. 45 S.W.3d at 629–30. And, as in this case, trial counsel in *Varelas* failed to request burden-of-proof or limiting instructions with regard to extraneous offenses. *Id.* at 631. The Court of Criminal Appeals reversed the defendant's murder conviction, concluding that trial counsel's performance was deficient in failing to request

appropriate jury instructions, and that defendant was prejudiced by his counsel's deficient performance. *Id.* at 633–34.

There are important differences, however, between this case and *Varelas*. In *Varelas*, the Court of Criminal Appeals refused to grant relief on direct appeal from the defendant's conviction, stating:

> In light of the number of ways and the degree to which a defendant can suffer harm from the admission of extraneous offense evidence, we have trouble understanding why trial counsel did not request a burden of proof or limiting instruction regarding these offenses. However, the bare record does not reveal the nuances of trial strategy. Further, to hold trial counsel's actions (or inaction) ineffective in the instant case would call for speculation and such speculation is beyond the purview of this Court. Rather, because of the strong presumptions that trial counsel's conduct falls within the wide range of reasonable professional assistance and that such conduct might be sound trial strategy, we must conclude, in light of an otherwise silent record, that appellant failed to meet his burden of showing that his trial counsel's assistance was ineffective.

*Id.* at 632. On subsequent habeas corpus review, trial counsel proffered an affidavit stating that "failure to request these instructions was not the result of trial strategy. It was simply an oversight." *Id.* Because the "trial could would have been required to give the instructions had counsel requested them" and given the evidence that the counsel's failure to request was not the "product of trial strategy," the Court of Criminal Appeals held that trial counsel's performance was deficient. *Id.*

11

Unlike *Varelas*, trial counsel's strategy here is expressly reflected in the record, which demonstrates that counsel chose to omit a request for inclusion of extraneous-offense instructions because he did not want any further attention to be drawn to potential extraneous offenses or misconduct committed by the defendant. In light of this evidence of trial strategy, appellant has not met his burden under the first *Strickland* prong of demonstrating that his trial counsel's failure to request jury instructions on extraneous offenses rendered his representation deficient. *Garcia v. State*, 887 S.W.2d 862, 889 (Tex. Crim. App. 1994) (citing *Strickland*, 466 U.S. at 687–89); *see also Agbogwe v. State*, 414 S.W.3d 820, 838 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("It is reasonable to conclude . . . [that] defense counsel decided that seeking an instruction to disregard Ozoh's testimony would only bring further attention to it"); *see also Delgado v. State*, 235 S.W.3d 244, 250 (Tex. Crim. App. 2007) ("[T]he decision of whether to request a limiting instruction concerning the proper use of certain evidence, including extraneous offenses, may be a matter of trial strategy").

We overrule appellant's first point of error.

## C. Failure to make objections

In his second point of error, appellant asserts that his counsel was ineffective for failing to object to statements made by investigating officers during appellant's videotaped statements because their probative value was allegedly outweighed by

12

potential prejudice. Appellant also argues that his counsel was deficient for failing to object to portions of his videotaped statements as either inadmissible hearsay or improper opinion testimony. Finally, appellant contends that counsel's failure to object to the use of his videotaped statements allowed the State to improperly convict him on "bad character" evidence. Appellant does not direct us to specific statements in support of each of these arguments, but his brief quotes all the following statements in support:

**(Second Interview – July 19, 2011)**

Q. [Johnson] Well, I will tell you this: there's injuries that are a little more significant that what you and Anita have explained. When I say "significant," I mean significant. I mean, she's got bleeding in her brain. She has a detached retina. And there's only certain ways that those things happen. Those aren't natural things that happen to a child, and they don't happen by falling onto a piano.

. . . .

Q: . . . Right, but keep in mind, I know what Texas Children's has told you, okay, 'cause I have their records here, okay? But I . . . an autopsy was done on her. I'm sure you're aware of that.

A. Yes.

Q: Okay? Autopsy . . . That's what it looks for. This is scientific stuff. Okay? And it's a medical fact that the bleeding she has in her brain, the detached retina, the other things that she's got going with her eyes . . . there's only one way that gets there. Okay? And from what everything that's been explained to us, you were the only one that was present when all this started happening.

A. So, me spending a few . . .

Q:    Hold on. Hold on.

A:    Hours with her, you're saying that, all of a sudden, all these problems just came wrong with her?

Q:    It can happen [snaps] that quick. That quick. Like a light switch shutting off. It's acute. It happens immediately. Okay?

Q:    . . . Ten months ago last week this happened. If I was in a hurry, I'd have arrested you that night. If I was just trying to put something on somebody, I'd have arrested you that night. I'd have arrested Anita that night, if I was just looking to put it on somebody. But, that's not how I work. I get all the facts – every one of 'em – and I have more than just those things.

. . . .

A.    . . . Okay, but, you need to understand how I function. I love Anita, and when she has that look . . . when she's asking me, you know, with tears almost coming out of her eyes, you know, "you think that, uh, her arm was fractured 'cause of how you handled her." I'm like "uh, baby, If . . . If I did hurt her by how I picked her up, I apologize to you, baby." That's what I said" "If I did hurt her, I apologize to you baby." And that's . . . that's the . . . courteous thing to do. If you hurt somebody by accident, you apologize. So you . . . . but you're asking me why would I apologize.

Q. Yeah. If you didn't do anything, why would you need to apologize?

A: 'Cause I told her *if* her arm was fractured from how I picked her up that one time [motioning with fists], I apologize for picking her up that way .. That's all I was saying.

. . . .

Q.    [Chandler]. . . I worked child abuse . . . what? Twelve years before I got here?

. . . .

Q.    I want you to tell me what your concerns are and what's going through your head right now.

A.    Well, I'm looking at is, I'm a black male and a baby was hurt and she died. . . . I'm not playing no race card, I'm just playing the

14

reality card. . . . It's the white detectives, white doctors, looking at a black male, who, at the time, had no job, and they're just looking for somebody to hang for the baby being hurt and dying.

. . . .

Q.     . . .The problem is the injury is acute . . . Acute means that . . . Like . . . Like . . . it had to have happened, like . . . a more severe. Acute just mean like very, very severe. . . Acute . . . Usually, right before a child expires, that means passes away . . . if you have head trauma, like, if something happens to your head, and it's acute, which is what she had . . . She had acute injury, then the child usually stop . . . has . . . the child usually throws up, has some type of seizure activity, and then the baby dies. Like [snaps] that.

A.     Well, she never threw up.

Q.     Well, you said she did.

A.     No. She spit up when I gave her CPR. She never threw up.

Q.     Right. But that's the same thing. That whole stuff comes up . . .

**(Third Interview – July 19, 2011)**

Q.     [Chandler] . . . This is really serious when you have a baby, and because she was so little, and she was so tiny, and she was so fragile, it's not likely that should would've . . . There's no way she could've inflicted those injuries on herself. So, something had to have happened to her, be it an accident that these things happened, but something had to have happened that these things occurred to her. It's not like she did 'em to herself. You know how some kids do some . . . something like that . . .

. . . .

Q.     . . . You know what, when they go to the autopsy . . . I hate to say this to you, but they have to take a chainsaw and they have to cut across, so it has to cut across the cartilage to give her a brain injury. That's not gonna [slaps the table] happen like that. That's . . . it's gotta be a whole lot more.

Q.     . . . I'm telling you is that particular day, shortly before she died, she had an acute head injury. That's what caused her death.

15

Now, yeah. There's some other things that happened to her that may have aggravated that injury, like, maybe if none of this other stuff had happened to her the weeks ago, maybe she hadn't fallen on the concrete, maybe if she hadn't done this, maybe if she hadn't done that, then this injury may not have been so bad, but when you have healing injuries, and then, you re-injure it more by something else, that injury, that day, made all this stuff react.

. . . .

Q.  . . . It's the new hemorrhages that caused her to die. . . . wasn't the old stuff. Was not the old stuff. So that's what the problem is.

. . . .

Q.  So what I'm telling you is that this thing was so severe this time, on top of all this stuff that was healing, that she didn't make it. . . . I have to make sure that I cover all the bases with you, because this is a fact. It's a fact that she had a significant injury that day. That's a fact. Now, how she got it, I don't know. And the only person that was there was you, Anita, and the baby. The baby ain't talking. She's not here. She can't talk anyway.

. . . .

Q.  . . . I'm just giving you an example, and then the baby . . . the baby's dead. She's dead, and she has significant trauma, but you say nothing happened. It don't add up. Something should add up. You're not communicating something. Maybe you forgot something. Maybe you're not thinking.

. . . .

Q.  That autopsy is science. You can't refute that. It's pictures, measurement, dah-dah-dah-dah-dah. You not gonna refute that. That's done. That's science . . . Her death. That body. . . That's evidence. That's science. That happened. Now, how do you explain all that stuff.

To demonstrate ineffective assistance of counsel for failure to object to the admission of testimony, appellant must identify the specific objection and prove that it would have been successful. *Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002). An isolated failure to object does not amount to deficient representation because whether "counsel provides a defendant adequate assistance

16

is to be judged by the totality of the representation rather than by isolated acts or omissions." *Vasquez v. State*, 819 S.W.2d 932, 938 (Tex. App.—Corpus Christi 1991, pet. ref'd) (finding counsel's performance was not deficient, given the totality of the circumstances, though he made the wrong objection to a jury argument).

### 1. Texas Rule of Evidence 403

At the pretrial hearing, counsel objected to "the manner in which the questioning was done by reference to outside materials or outside matters," and to certain comments by Sergeant Torres as impermissible medical expert testimony. Additionally, he objected to the admissibility of one of the statements on both statutory grounds and substantive grounds.

On appeal, appellant argues that even if these pretrial objections were properly overruled, trial counsel should have then objected under Rule 403 of the Texas Rules of Evidence that the probative value of such evidence was outweighed by the danger of unfair prejudice, confusion of the issues, and misleading of the jury. *See* TEX. R. EVID. 403.

Appellant does not cite supporting authority or identify specifically how the probative value of any particular statement was outweighed by the dangers of prejudice, confusion or misleading the jury under Rule 403. *See Santellan v. State*, 939 S.W.2d 155, 173 (Tex. Crim. App. 1997) (holding that "merely list[ing] these

17

exhibits in a table with a brief phrase describing the content of the photographs . . . is not enough information for this Court to adequately address appellant's unarticulated Rule 403 complaints. . . . We decline to make appellant's arguments for him."). Appellant likewise fails to articulate how, absent his counsel's failure to lodge a Rule 403 objection to these statements, a different outcome would have been likely. *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996).

## 2. Hearsay and Opinion

Next appellant argues that he was deprived of reasonably effective assistance of counsel because counsel "failed to point out specific improper hearsay and expert opinion testimony by police during the various statements." He acknowledges the State's position that many of the questions the jury heard posed by investigators on appellant's videotaped statements were "contextual." But he contends that the statements went beyond acceptable background and contextual purposes, such that an objection would have been sustained had his counsel made such an objection. *See Langham v. State*, 305 S.W.3d 568, 580–82 (Tex. Crim. App. 2010) (police officer's testimony about confidential informant's statements to him "crossed the line" from any permissible "background" relevance, particularly because the State relied on statements as evidence during closing arguments).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

18

asserted." TEX. R. EVID. 801(d). Thus, an out-of-court statement is admissible if it is not offered to prove the truth of the matter asserted. *See Jones v. State*, 843 S.W.2d 487, 499 (Tex. Crim. App. 1992). Opinion testimony by a witness who is not testifying as an expert may be admissible if it is based upon firsthand sensory experience. *Osbourn v. State*, 92 S.W.3d 531, 539 (Tex. Crim. App. 2002). A witness may testify in the form of opinions and inferences, but this testimony is limited to inferences and opinions which are (1) "rationally based on the perception of the witness" and (2) "helpful to a clear understanding of the witness' testimony or the determination of a fact issue." TEX. R. EVID. 701; *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997). An opinion is rationally based upon perception if a reasonable person could draw the opinion based upon personal knowledge or experience. *Fairow*, 943 S.W.2d at 899–900.

Without offering specific arguments about specific statements, appellant complains about the police interviewers' recounting the contents of hospital and autopsy documents during appellant's videotaped interviews as being hearsay. We agree with the State that many of the interviewers' statements fall within the bounds of admissible evidence because they were not offered for the truth of the matter asserted; rather, they were designed to probe appellant into providing more accurate information, given the disconnect between the severity of Alycia's injuries and appellant's version of events. *See Hernandez v. State*, No. 01-08-

19

00306-CR, 2009 WL 1331649, at *6–8 (Tex. App.—Houston [1st Dist.] May 14, 2009, pet. ref'd) (mem. op., not designated for publication) (holding that "statements made by police officers during an interview are not hearsay if they are offered only to give context to the interviewee's replies, even if the officers accuse the interviewee of lying and refer to the statements of unnamed witnesses"). "Statements offered only to show their effect on the listener are not hearsay." *Id.* at *6. Viewing the interviews as a whole, we conclude that the interviewers' statements about the contents of the hospital and autopsy records gave context to appellant's answers and reactions. Appellant has thus not demonstrated that redaction of these statements would have been required even had his counsel objected. We therefore reject the argument that counsel's failure to object constituted ineffective assistance of counsel. *Ex parte Jimenez*, 364 S.W.3d 866, 887 (Tex. Crim. App. 2012) ("The failure to object to proper questions and admissible testimony . . . is not ineffective assistance.").

To the extent that any of the statements went beyond context and amounted to inadmissible hearsay, we also note that appellant's argument ignores that the majority of the complained-of statements about the medical nature of Alycia's injuries are cumulative of evidence introduced through the testimony of Lopez, an assistant medical examiner, and Love, a forensic anthropologist. Chandler's comments during appellant's videotaped interview describing hemorrhaging in

20

Alycia's brain and her detached retina are supported by Lopez's testimony that Alycia had subscapular hemorrhages indicative of blunt trauma to her head, bilateral retinal hemorrhages, and a partially detached retina.

Chandler's statement that subdural hemorrhaging is not a result of "natural things that happen to a child, and [does not] happen by falling onto a piano," and that "there's only one way that gets there," is consistent with Love's testimony that Alycia's injuries were not consistent with what she would expect to see from a regular fall. Chandler's statement was also consistent with Lopez's testimony that "[w]ith a normal toddler fall from a standing position to the ground, I would not expect to see that severity of subdural and retinal hemorrhages." According to Lopez, it would take a "very severe, forceful blow to her abdomen" to cause the injuries Alycia had.

Similarly, Chandler's description of what happens "right before a child expires" is consistent with Lopez's testimony that it would not be unusual for a child suffering from a brain injury to exhibit seizure-like activity or vomit. While not directly supported by testimony, Chandler's comments were sufficiently aligned with the experts' testimony; as such, they cannot be held the basis for harmful error.[1] We thus conclude that the medical evidence discussed by

---

[1] While most of Chandler's statements were medically accurate and supported by other testimony, appellant points out that her explanation of the term "acute" was not correct. During the third videotaped interview, Chandler tells appellant that

21

interviewers during appellant's videotaped statements was cumulative and its admission was harmless. Appellant cannot show the lack of objection to these statements constituted ineffective assistance. *See Frohne v. State*, 928 S.W.2d 570, 576 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd), *cert. denied, Frohne v. Texas*, 522 U.S. 812 (1997); *Marlow v. State*, 886 S.W.2d 314, 318 (Tex. App.—Houston [1st Dist. 1994, pet. ref'd); *see also Jensen v. State*, 66 S.W.3d 528, 537 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (citing *Matz v. State*, 21 S.W.3d 911, 912–13 (Tex. App.—Fort Worth 2000, pet. ref'd)) (When statements in "a videotape [are] cumulative of [another witness's] properly admitted testimony on the same issue, even if the trial court erred in admitting the videotape, we must disregard the error because it could not have affected appellant's substantial rights.").

### 3. Character Evidence

Finally, appellant contends that his counsel was ineffective for failing to object that "[m]uch of the State's use of [appellant's] statement[s] was akin to calling a witness for the purpose of impeaching him with evidence of bad

---

"[a]cute means like very, very severe" and that an acute injury results in the child's immediate death. Lopez and Love, however, correctly testified that the terms "acute" and "chronic" are used to refer to how recently an injury occurred, with an acute injury generally being one that has occurred in the last 48 hours. But the autopsy results and medical testimony overwhelmingly show that Alycia's injuries were, in fact, *both* severe and acute. We are thus confident that Chandler's misstatement that acute means severe could not have impacted the jury's interpretation of the severity of the actual injuries, on which the jury heard extensive testimony from multiple witnesses.

22

character." In support, he cites *Hughes v. State*, 4 S.W.3d 1 (Tex. Crim. App. 1999). In that case, the State called a witness that it knew would offer no favorable testimony in support of its case, as demonstrated by the witness's unfavorable testimony at two previous hearings. *Id.* at 4–5. The State then called a different witness to impeach the first witness with testimony about the first witness's prior inconsistent statements. *Id.* at 4. The Court of Criminal Appeals held that the trial court's allowing the State to call a witness under the guise of impeachment to get in otherwise highly prejudicial, inadmissible evidence was improper under the circumstances and erroneous under Rule 403 of the Texas Rules of Evidence:

> While these maybe legitimate reasons for calling K.P. to testify at appellant's trial, the State fails to offer this Court any explanation for why it expected K.P. to testify differently than she had at the pretrial hearing. More importantly, however, an examination of the record reveals the State elicited no favorable testimony from K.P. The lack of favorable testimony suggests the State was attempting to use K.P.'s prior inconsistent statements under the guise of impeachment for the primary purpose of placing before the jury evidence which was not otherwise admissible. Consequently, we conclude the State had little, if any, legitimate purpose in admitting K.P.'s prior inconsistent statements to impeach her testimony. Due to the highly prejudicial nature of this evidence we conclude any probative value it may have had was substantially outweighed by its prejudicial effect.

*Id.* at 7.

Appellant insists this case is similar, and argues that because the State played up during opening statement and closing arguments that his videotaped interviews reflected that he was "a self-absorbed, self-centered liar," the jury may

23

have convicted him of murder because of "his alleged character as an insensitive liar." Accordingly, appellant contends that his counsel was ineffective for failing to object that admission of his videotaped interviews "allowed the State to place him on trial for bad character, in effect impeaching him through his statements even though he elected not to testify."

*Hughes* is inapposite. This case does not involve use of an otherwise inadmissible prior statement to impeach a testifying witness. Appellant's videotaped statements were admissible under the rule permitting an accused's prior statement be admitted if the statement was made "freely and voluntarily and without compulsion or persuasion." TEX. CODE CRIM. PROC. ANN. art. 38.21 (Vernon 2005). Appellant does not challenge the voluntariness of his statements to police, and he cites us no authority for excluding an accused's prior statement from evidence because the State relies on that prior statement to argue that the accused had been untruthful and not shown remorse about the accused alleged role in the charged conduct.

In addition, as the State points out, the general allegations in appellant's brief do not identify which statements amounted to inadmissible character evidence for purposes of impeachment. *See* TEX. R. APP. P. 38.1(i). Appellant has thus failed to demonstrate that his counsel rendered deficient performance by

24

failing to object to admission of his videotaped statements as improper impeachment and character evidence.

We overrule appellant's second point of error.

### D. Totality of the Representation

In his third point of error, appellant contends that—when viewed in light of the totality of the representation—trial counsel's conduct deprived appellant of reasonable effective assistance of counsel. *See Frangias v. State*, 392 S.W.3d 642, 653 (Tex. Crim. App. 2013) ("[A] reviewing court must look to the totality of the representation in gauging the adequacy of counsel's performance."). Appellant has not demonstrated, in light of the totality of the representation and the strength of the evidence about which appellant has not complained, a reasonable probability that the jury would have delivered a different verdict.

We overrule appellant's third point of error.

### CONCLUSION

We affirm the trial court's judgment.



# JUDGMENT

## Court of Appeals

## First District of Texas

NO. 01-13-00234-CR

TERRENCE BRENT MCNEIL, Appellant

V.

THE STATE OF TEXAS, Appellee

Appeal from the 338th District Court of Harris County.   (Tr. Ct. No. 1362563).

This case is an appeal from the final judgment signed by the trial court on March 19, 2013. After submitting the case on the appellate record and the arguments properly raised by the parties, the Court holds that the trial court's judgment contains no reversible error. Accordingly, the Court **affirms** the trial court's judgment.

The Court **orders** that this decision be certified below for observance.

Judgment rendered November 20, 2014.

Panel consists of Chief Justice Radack and Justices Jennings and Keyes. Opinion delivered by Chief Justice Radack.

Opinion issued November 20, 2014



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00234-CR

———————————

**TERRENCE BRENT MCNEIL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

On Appeal from the 338th District Court
Harris County, Texas
Trial Court Case No. 1362563

---

## CONCURRING OPINION

I join the majority in its analysis of the second and third issues of appellant,

Terrence Brent McNeil. However, because the evidence about which appellant

specifically complains in his first issue does not, as he asserts, constitute evidence

of an extraneous offense, wrong, or bad act, but rather general background

evidence, I concur in the judgment of this Court affirming his conviction of the offense of felony murder.[1]

In his first issue, appellant argues that his trial counsel provided him with ineffective assistance because counsel "fail[ed] to request a limiting instruction and a burden-of-proof instruction on extraneous offenses."

A defendant is "entitled to be tried on the accusations made in the State's pleading and he should not be tried for some collateral crime or for being a criminal generally." *Ex parte Varelas*, 45 S.W.3d 627, 630 (Tex. Crim. App. 2001) (orig. proceeding) (quoting *Wilkerson v. State*, 736 S.W.2d 656, 659 (Tex. Crim. App. 1987)). Thus, generally, evidence of extraneous offenses, wrongs, or bad acts "is not admissible to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b). However, it may be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

Once a trial court rules that evidence of an extraneous offense, wrong, or bad act is admissible, it must instruct the jury about the limitation on its use of the extraneous matter if the defendant so requests. *Varelas*, 45 S.W.3d at 631. The Texas Court of Criminal Appeals has also explained that "'when evidence of collateral crimes is introduced for one of the various purposes for which such

---

[1] *See* TEX. PENAL CODE ANN. § 19.02(b)(3) (Vernon 2011).

2

evidence becomes admissible, the jury should be instructed that they cannot consider against the defendant such collateral crimes, unless it has been shown to their satisfaction that the accused is guilty thereof.'" *Id.* (quoting *Lankford v. State*, 93 Tex. Crim. 442, 248 S.W. 389, 389 (1923)). In other words, the jury should be instructed that it is not to consider extraneous-offense evidence unless it believes beyond a reasonable doubt that the defendant committed the offense. *Id.*

In support of his argument that his trial counsel provided him ineffective assistance, appellant relies on *Varelas*. In *Varelas*, the State presented evidence that the defendant, before committing the charged offense of capital murder, had committed specific extraneous bad acts against the complainant: he had "excessively dunked [the complainant] in a swimming pool, had 'thumped' the back of her head, had pushed her with his foot, had made her sit still on a couch for over two hours, and had hit her the night before her death." *Id.* at 630. And the State argued "because [appellant] had committed these [extraneous] acts, he must have been the person responsible for [the complainant's] death." *Id.* The defendant's attorneys did not "request that either burden of proof or limiting instructions be included in the guilt/innocence charge regarding these extraneous acts, even though the attorneys noted during pre-trial hearings that such instructions would be proper." *Id.* Noting that "[t]he trial court would have been required to give the instructions had counsel requested them, and reasonable

3

counsel would have requested the instructions given the facts of th[e] case," the court of criminal appeals held that the performance of the defendant's trial counsel was "deficient." *Id.* at 632.

Here, in contrast to the defendant in *Varelas*, appellant's complaint, as presented in his briefing to this Court about his trial counsel's performance, does not actually concern any specific extraneous offense, wrong, or bad act. Rather, appellant complains generally only about the following:

> The extraneous offense evidence started with the first witness, Ruby Cantu, who babysat [the complainant] starting in July of 2010. Ms. Cantu testified that in the first three weeks of child care, *she did not notice any bruises or injuries on the [complainant]*. When Ms. Cantu became ill and called [the complainant's mother] to say she would not be able to care for the [complainant], Ms. Cantu learned that [appellant, the boyfriend of the complaint's mother], would babysit. *Thereafter, Ms. Cantu noticed the [complainant] had become more quiet and withdrawn. She also began to notice ever-more serious bruising.*

> In early September, when Ms. Cantu picked up the [complainant] from [her mother] at [her] workplace, *she noticed bruises on the [complainant's] head and left arm.* She drove [the complainant's mother] and the [complainant] to the hospital. *She learned the next day that the [complainant's] arm was broken. [The mother's] explanation for the [complainant's] injuries did not make sense to Ms. Cantu.* Ms. Cantu photographed the bruises she saw on [the complainant], called Children's Protective Services, and concocted an excuse for telling [the complainant's mother] that she could no longer babysit. This extraneous offense evidence all came before the jury with no objection, and no request for a limiting instruction and burden-of-proof instruction.

> The State also offered evidence of *extraneous acts of injury* to the [complainant] through the testimony of forensic anthropologist Dr.

4

Jennifer Love. The State further bolstered its theory that [appellant] was responsible for the extraneous offenses – and the [complainant's] death – through the testimony of assistant medical examiner Dr. Ana Lopez, and her records.

(Emphasis added) (internal citations omitted.)

In sum, appellant complains that the jury heard evidence that Cantu (1) observed that the complainant became "more quiet and withdrawn" and had "ever-more-serious bruising" after appellant had babysat her in July 2010; (2) observed, after picking up the complainant from her mother on September 7, 2010, that the complainant had bruising on her head and left arm; (3) learned, after driving the complainant and her mother to the hospital, that the complainant's arm had been broken; and (4) did not think the mother's explanation for the complainant's injuries "ma[d]e sense." Characterizing the above evidence as "extraneous offense evidence," appellant complains that it "all came before the jury with no objection, and no request for a limiting instruction and burden of proof instruction." Appellant also generally complains about the testimony of Drs. Love and Lopez about "extraneous acts of injury to the [complainant]." However, while he does provide one record cite for the testimony of each doctor, a review of the portion of the record cited does not reveal any testimony about an extraneous offense, wrong, or bad act committed by appellant.

Although appellant, in his briefing, characterizes the evidence about which he now complains as "extraneous offense evidence," it actually constitutes general

5

background evidence about previous injuries sustained by the complainant and her mother's, not appellant's, explanations for those injuries. The only portion of Cantu's testimony that actually concerns appellant is her observation that the complainant became "more quiet and withdrawn" and had "ever-more-serious bruising" after appellant had babysat the complainant in July 2010. The bulk of appellant's complaint concerns Cantu's observations of the complainant's injuries in the presence of her mother, not appellant.

As explained by the court of criminal appeals, general background evidence "is admissible, not because it has particularly compelling probative value with respect to the elements of the alleged offense, but simply because it provides the jury with perspective, so that the jury is equipped to evaluate in proper context, other evidence that more directly relates to elemental facts."[2] *Langham v. State*, 305 S.W.3d 568, 580 (Tex. Crim. App. 2010) (emphasis omitted). In other words, it puts the trier of fact "in a better position to evaluate evidence and determine facts for deciding a material proposition after learning the background." PETER T. HOFFMAN, TEXAS RULES OF EVIDENCE HANDBOOK 182 (2011 ed.). General background evidence "thus tends to make the material proposition more or less

---

[2] General background evidence should not be confused with "'same transaction' contextual evidence," which concerns other offenses, wrongs, and bad acts connected to a primary charged offense, or "'background' contextual evidence" that possesses a "character component." *See Mayes v. State*, 816 S.W.2d 79, 86–88 (Tex. Crim. App. 1991).

6

likely." *Id.* Because it is relevant, it is generally admissible. *See* TEX. R. EVID. 402.

Here, as noted by appellant in his briefing, the complainant and her mother moved to Houston from Alaska, where the mother "left behind a caseworker file due to suspected child neglect and medical evidence of the [complainant's] failure to thrive." Further, the complainant's mother was also "charged in connection with the death" of the complainant. Importantly, as noted by appellant, "[n]o one testified to having seen [him] abuse or injure" the complainant, and his trial counsel "offered medical records to show the [complainant's] extensive medical history – including treatment for neglect and failure to thrive – and medical problems that existed from birth."

Indeed, trial counsel actually used the evidence regarding the complainant's other injuries and her mother's neglectful care to argue to the jury that, although appellant had admitted that he had "probably" broken the complainant's arm on September 7, 2010 and injured her on the date of her death,

> somebody else was there in that house, too. And you've heard about her and what happened and what she was like. I didn't make up those references to neglect when [the complainant] was barely out of the womb. How many children do you know have CPS care workers at less than a year old?

Trial counsel also used the evidence regarding the complainant's other injuries to argue to the jury that the complainant was a "fragile" child and, thus, when

7

appellant injured her on the date of her death, "[h]e was reckless, he was negligent, and he was wrong," but he did not intentionally injure the complainant and cause her death.

The evidence about which appellant specifically complains in his briefing to this Court does not concern any specific extraneous offense, wrong, or bad act committed by him which would warrant limiting and burden-of-proof instructions. Accordingly, I would hold that appellant has not established that his trial counsel's performance was deficient for failure to request such instructions. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). In contrast, the majority holds that appellant has not established that his trial counsel's performance was deficient because "trial counsel's strategy here is expressly reflected in the record, which demonstrates that counsel chose to omit a request for inclusion of extraneous-offense instructions because he did not want any further attention to be drawn to potential extraneous offenses or misconduct committed by the defendant."

As noted by the majority, both the court of criminal appeals and this Court have stated that an attorney's intentional omission of limiting and burden-of-proof instructions from a jury charge might be considered reasonable trial strategy. *See Delgado v. State*, 235 S.W.3d 244, 250 (Tex. Crim. App. 2007) ("[T]he decision of whether to request a limiting instruction concerning the proper use of certain

8

evidence, including extraneous offenses, may be a matter of trial strategy"); *Agbogwe v. State*, 414 S.W.3d 820, 838 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("It is reasonable to conclude . . . [that] defense counsel decided that seeking an instruction to disregard [extraneous offense] testimony would only bring further attention to it.").

However, it appears readily apparent that such a "trial strategy," as a matter of law, should not be considered reasonable and sound at the guilt phase of a criminal trial. Indeed, if a jury is not properly instructed that it may only consider evidence that a defendant committed an extraneous offense, wrong, or bad act for a limited purpose, and not to prove the character of the defendant "to show action in conformity therewith," then the jury may in fact consider the extraneous offense evidence for the improper purpose of establishing action in conformity with character. Moreover, if the jury is not further instructed that it may consider such evidence only if it believes beyond a reasonable doubt that the defendant committed the extraneous offense, wrong, or bad act, then the jury may actually consider the evidence, even if it does not believe beyond a reasonable doubt that the defendant committed the extraneous offense. In effect, the so-called "strategy" of not requesting a burden-of-proof instruction for evidence of extraneous offense, wrongs, and bad acts actually relieves the State of its burden of proof. Thus, the

9

failure to request the proper limiting and burden-of-proof instructions for evidence of extraneous offense, wrongs and bad acts, in reality, constitutes a guilty plea.

Regardless, as discussed above, we need not reach the issue in this case.


Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Jennings, J., concurring.

Publish. TEX. R. APP. P. 47.2(b).