# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00422-CR

**Raymond Swan, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 403RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-17-200253, THE HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## M E M O R A N D U M  O P I N I O N

The State indicted Raymond Swan for possession of a controlled substance in Penalty Group 1, methamphetamine, in an amount of four grams or more but less than 200 grams. *See* Tex. Health & Safety Code §§ 481.102(6), 481.115(a), (d). The indictment contained two enhancement paragraphs, alleging that Swan had four prior felony drug convictions. The State also indicted him for two counts of aggravated sexual assault, but trial proceeded only on the possession charge. The jury convicted Swan of the possession charge. In the punishment phase, the State offered evidence of the prior felony drug convictions and the as-yet-unprosecuted sexual assaults. The jury found the enhancement paragraphs to be true and assessed 70 years' imprisonment. *See* Tex. Penal Code § 12.42(d). The trial court entered a conforming judgment.

In his sole appellate issue divided into four sub-issues, Swan contends that trial counsel provided him ineffective assistance for failing to object to (1) comments by the prosecutor during guilt–innocence jury argument, (2) punishment testimony by one of the alleged

sexual-assault child victims, (3) punishment testimony by a Sexual Assault Nurse Examiner (SANE), and (4) comments by the prosecutor during punishment jury argument. We affirm.

## BACKGROUND

### Guilt–innocence evidence

Department of Public Safety (DPS) troopers obtained a warrant to search a room at an extended-stay hotel in Austin for methamphetamine, Xanax "bars," and other illegal drugs. Before executing the search, the troopers did "workups on the hotel[]" and on the "people that live[d] there." During their investigation, the troopers learned that Swan had stayed at the hotel for several months; was the only registered guest for his room; and paid for his room weekly in cash, always wearing a hat and sunglasses. The manager often saw Swan wearing a hat and sunglasses at other times, and surveillance footage at the hotel showed Swan doing laundry at the hotel's facility while wearing a hat and sunglasses.

To execute the search, troopers knocked on the room's door and announced, and Swan answered the door wearing only his boxers. He had been asleep in the room's bed alongside a woman. When the troopers entered the room and handcuffed Swan, he asked for a pair of his shorts on the floor, which did not look like women's shorts, so he could clothe himself. The troopers obliged but searched the shorts before giving them to Swan. They found inside a pocket of the shorts a Versace sunglasses case, and inside were methamphetamine, cocaine, and Xanax. Later testing revealed that there was 5.42 grams of methamphetamine in the case.

The troopers searched the rest of the room and found a pair of Versace sunglasses in a drawer. In the same drawer were papers that had Swan's name on them, including information about automobile insurance. Also in a drawer were small, blue plastic baggies, which "are commonly used to store and distribute narcotics," and an electronic scale, which is commonly

2

"used by distributors of narcotics to weigh their substance before they sell it." Elsewhere in the room, the troopers found pictures of Swan wearing Versace sunglasses, like those in the drawer and with a logo matching the one on the sunglasses case, and the same pair of shorts that Swan asked for and in which the troopers found the methamphetamine.

The room had a kitchenette, and the troopers found Pyrex measuring cups holding purple–pink and green liquids and a white, powdery residue. They recognized the cups as ones "commonly used to basically cook dope, cut dope, [and] cut drugs." Another white substance recovered from the room tested positive for caffeine, a common cutting agent for drugs.

After the close of the guilt–innocence evidence, the jury returned a guilty verdict for Swan's possession of the 5.42 grams of methamphetamine.

*Punishment evidence*

During punishment, the State offered evidence of the indicted aggravated sexual assaults, helping to explain why the DPS troopers came to be involved with Swan. Two teenage girls—K.L., who was then 16 years old, and F.T., then 14—ran away from their homes near Conroe. A missing-children alert went out to law enforcement, and DPS troopers began a human-trafficking investigation to find the girls.

Before they ran away, K.L. and F.T. were hanging out together when F.T. met a man named "D" on a website. F.T. told K.L. that D had a lot of money and that the girls "could go with him." The girls met D near Conroe, and he drove them to an apartment in Houston and eventually to an extended-stay hotel in Austin. Unbeknownst to the girls at the time, D brought the girls to the hotel where Swan was staying, and D wanted them to prostitute. When they refused,

3

D kicked them out, leaving them with no money, phone, or place to go. F.T. met a man in the hotel's parking lot—Swan—and the two girls went with him.

The girls stayed with Swan for a few days, during which he did not let them use his phone for help. The girls lied about their ages, but Swan found out their real ages from a missing-persons flyer retrieved on his phone. Their first day together, Swan gave K.L. a Xanax bar and started giving her a massage. She then "blacked out," causing her not to "remember anything," and she woke up later without clothes on.

Over the course of the days that the girls spent in Swan's hotel room, they smoked "weed" with him and slept in the same bed with him. Swan had sex with K.L. both before and after he learned her real age. She felt as though she had to have sex with him just to be able to stay in his room. K.L. also saw Swan having sex with F.T., after he learned F.T.'s real age. F.T. told K.L. that she and Swan also "did anal" both before and after he learned her real age.

At the end of those several days, Swan told the girls that they had to leave because his daughter, who was close in age to them, was coming over. He started driving the girls to a nearby Walmart and had them call their parents to pick them up from there. During the drive, Swan's car was struck by a drunk driver. Police officers reported to the scene of the wreck and saw the two girls walking away nearby. Swan had told the girls to get out of the wrecked car and leave "or he'll get in trouble with the cops if [they]'re with him." Officers talked to the girls, and the girls said through tears that they were the subject of a missing-persons alert and that they had been with an adult male. The police arranged for DPS troopers to interview the girls to continue the human-trafficking investigation.

Troopers learned from the girls that they were in the car that Swan was driving and that they had been living with him for several days and smoking weed with him and learned that

4

he sold crack. Troopers obtained the search warrant for Swan's hotel room both for drugs and based on "a potential human trafficking case." Using a photo of Swan, troopers confirmed with the hotel's manager that Swan was the person living in the room that the girls had stayed in.

The girls underwent forensic interviews at a Children's Advocacy Center and an exam by a SANE. The SANE who examined K.L. told the teenager about the exam and asked her about any pain that she was feeling and for the history of Swan's alleged sexual assaults. During the exam, K.L. told the SANE that Swan had penetrated her vagina with his penis, fingers, and mouth. She also explained, in the SANE's words, that she had been "physically restrained and chemically restrained," coerced, and made afraid during the several days with Swan.

The SANEs who examined the girls took swabs from them, including anal and buttocks swabs from F.T. Relatedly, the troopers obtained a DNA search warrant for Swan and a warrant to search his cell phones. During their search of the hotel room, they seized bedsheets, cell phones, used feminine-hygiene products, and a jacket with "pimp" written on it. Hotel surveillance footage had shown Swan washing bedsheets in the laundry facility, which was unusual for the hotel's guests to do. One of Swan's seized cell phones contained images of the missing-persons flyer about the two girls, internet searches for missing-persons reports from the girls' home area, and a selfie photo of the girls with Swan.

DNA testing confirmed the presence of male DNA on the anal and buttocks swabs taken from F.T. A DPS forensic scientist tested the swabs and concluded that it was 99 octillion 400 septillion times more likely that the anal swab's DNA came from F.T. and Swan than if it had come from F.T. and a different, unknown person. The scientist also concluded that it was 447 billion times more likely that the buttocks swab's DNA came from F.T. and Swan than if it had come from F.T. and a different, unknown person.

5

After the close of the punishment evidence and instructions on the applicable punishment ranges, the jury assessed punishment at 70 years' imprisonment. The trial court entered judgment in accordance with the jury's guilty verdict and assessment of punishment. Swan now appeals the judgment.

## APPLICABLE LAW AND STANDARD OF REVIEW

To succeed on an ineffective-assistance claim, the appellant must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Garza v. State*, 213 S.W.3d 338, 347 & n.18 (Tex. Crim. App. 2007) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To show deficient performance, the appellant must prove by a preponderance of the evidence that counsel's representation fell below the standard of professional norms. *Id.* at 347–48 & n.19 (citing *Strickland*, 466 U.S. at 688). If the alleged deficient performance is a failure to object, the appellant must show that the trial court would have committed harmful error by overruling the objection had counsel made it. *Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004); *West v. State*, 474 S.W.3d 785, 790 (Tex. App.— Houston [14th Dist.] 2014, no pet.). To show prejudice, the appellant must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Garza*, 213 S.W.3d at 348 & n.20 (citing *Strickland*, 466 U.S. at 694). Absent either showing, a reviewing court must deny relief because it cannot conclude that the conviction resulted from a breakdown in the adversarial process that made the result unreliable. *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *Ex parte Menchaca*, 854 S.W.2d 128, 131 (Tex. Crim. App. 1993).

Appellate review of trial counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance. *Garza*, 213 S.W.3d at 348. Counsel's performance is evaluated not in hindsight but instead from counsel's perspective at the time of trial. *Strickland*, 466 U.S. at 689; *Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim. App. 1993). If the reasons for counsel's conduct do not appear in the record and if there is at least the possibility that the conduct could have been grounded in legitimate trial strategy, the reviewing court defers to counsel's decisions and denies relief on an ineffective-assistance claim on direct appeal. *Garza*, 213 S.W.3d at 348; *see also Robertson v. State*, 187 S.W.3d 475, 482 (Tex. Crim. App. 2006) ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action '*might* be considered sound trial strategy.'" (emphasis added) (quoting *Strickland*, 466 U.S. at 689)). Counsel usually should be afforded an opportunity to explain their actions; without such an opportunity, the reviewing court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Thus, absent an evidentiary hearing on the issue, the ineffective-assistance burden is difficult to meet: "Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *Blevins v. State*, 18 S.W.3d 266, 271–72 (Tex. App.—Austin 2000, no pet.).

## INEFFECTIVE ASSISTANCE OF COUNSEL

### I. Failure to object to alleged misstatement of law in guilt–innocence jury argument

Swan subdivides his sole appellate issue—ineffective assistance by his trial counsel—into four sub-issues for four respective instances of alleged ineffective assistance for

failing to make objections. In his first sub-issue, Swan contends that counsel should have made a misstatement-of-law objection to one remark by the prosecutor during guilt–innocence jury argument. The prosecutor remarked, "Anywhere in the hotel room that the search warrant was executed for, anywhere, a reasonable jury could find that that was possession."

Jury argument is objectionable if it falls outside these categories of proper argument: (1) summary of evidence, (2) reasonable deduction from the evidence, (3) response to argument of opposing counsel, and (4) plea for law enforcement. *See Ex parte Lane*, 303 S.W.3d 702, 711–12 (Tex. Crim. App. 2009); *Lagrone v. State*, 942 S.W.2d 602, 619 (Tex. Crim. App. 1997). "Counsel is allowed wide latitude without limitation in drawing inferences from the evidence so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith." *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988). Jury argument thus must be extreme or manifestly improper, or must inject new and harmful facts into evidence, to constitute reversible error. *Id.* A failure to object to proper jury argument is not ineffective assistance. *Browne v. State*, 483 S.W.3d 183, 199 (Tex. App.—Austin 2015, no pet.) (citing *Richards v. State*, 912 S.W.2d 374, 379 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd)).

Also, jury argument that misstates the law or is contrary to the jury instructions is improper. *Kuhn v. State*, 393 S.W.3d 519, 540 (Tex. App.—Austin 2013, pet. ref'd). "Defense counsel has a duty to correct misstatements of law that are detrimental to his client." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). A reviewing court deciding whether a statement during argument is improper or a misstatement of law must keep in mind the statement's context. *See Gaddis*, 753 S.W.2d at 398; *Kuhn*, 393 S.W.3d at 540 (citing *Drew v. State*, 743 S.W.2d 207, 220 (Tex. Crim. App. 1987)).

8

We begin by placing the prosecutor's remark in context. In the following portion of his jury argument, the prosecutor described his deductions from the "overwhelming" evidence of Swan's possession. Amid this, the prosecutor offered the remark as a hypothetically closer case than Swan's was:

> The methamphetamine was found inside a sunglass case, a Versace sunglass case in particular. You can see the label right here. Versace sunglasses. [Swan] also had pictures of himself out. These are the Versace sunglasses. They're missing a lens. That's why they were not inside the sunglass case, but why throw away a good sunglass case? Those things are Versace. Might as well put my stash in here. And it's important to note that he has pictures of himself actually with those same sunglasses on. You will see the distinctive logo right here. You will see it right here.
>
> Hat and sunglasses. "The soul of this man is his clothes." Do you recall the security footage? Inside he paid for cash wearing his sunglasses. That's fine. But it's very clear these sunglasses are important to him. Paying for cash, had on sunglasses. Doing his laundry, had on sunglasses. All of these things are identifying him, linking him, putting that particular sunglass cases with those particular drugs closer and closer and closer and closer to him. And they don't have to be that close. *Anywhere in the hotel room that the search warrant was executed for, anywhere, a reasonable jury could find that that was possession.* But the shorts he identified as his.
>
> You are representatives of this community. You took an oath to apply the law to the facts as presented. This is an overwhelming case. It's an overwhelming case. Imagine what possible more evidence the State could have put on.
>
> Inside, many things that are consistent with a search warrant: bags, scales, looks like a little mixing, you got the Pyrex containers, using the kitchenette supplies plus his own, caffeine. All right. Everything that would indicate that he is cutting, that he is cutting, packaging, distributing.

(Emphasis added.)

Seen in context, the remark was a mixed statement of fact and law about a hypothetically closer possession case than this one was. *See, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 696–97 (1996) (question about whether certain facts satisfy relevant legal standard was mixed question of fact and law); *Hubert v. State*, 312 S.W.3d 554, 559–60 (Tex. Crim. App.

9

2010) (question about "application of legal principles to facts" was mixed question of fact and law). The prosecutor was asking the jury to imagine that, keeping everything else constant, the methamphetamine was not in the sunglasses case but was instead anywhere else in Swan's room— "the" hotel room, not just "any" hotel room or "a" hotel room. The prosecutor was suggesting that had the jury heard such a case instead, it still reasonably could find the possession element to be proven. *Cf. McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex. Crim. App. 1985) (review for whether reasonable jury could find possession element proven when defendant did not exclusively control premises is governed by reviewing for "links" between defendant and thing allegedly possessed). The prosecutor's remark thus was not a pure statement of law; it involved reasonable factual deductions from the evidence. *See Gaddis*, 753 S.W.2d at 398 (to support reversible error, jury-argument deductions from evidence must be extreme or manifestly improper or inject new and harmful facts into evidence). And it did not misapply possession law to those factual deductions. *See Figueroa v. State*, 250 S.W.3d 490, 501–02 (Tex. App.—Austin 2008, pet. ref'd) (sufficient evidence "linked" defendant to cocaine in his apartment's bedroom in part because apartment was his residence; his belongings, including men's clothing, were also in bedroom; other contraband, including digital weight scale, was in apartment; no one else lived in apartment besides defendant and female roommate; and apartment lease listed defendant as "occupant"); *Stubblefield v. State*, 79 S.W.3d 171, 175 (Tex. App.—Texarkana 2002, pet. ref'd) (sufficient evidence "linked" defendant to cocaine found near coffee table of house that defendant shared with others in part because defendant was present and near cocaine when search was conducted, defendant was living in a bedroom of the house, and there was other drug paraphernalia in plain view).

Swan argues that the remark contradicted the jury instructions that possession "means actual care, custody, control or management" and that it "is a voluntary act if the possessor

10

knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control." We see no contradiction. The remark relied on the evidence of Swan's longtime occupation of the hotel room, including as his residence; his other personal effects in the room, including clothes and papers; drug paraphernalia in the room; and no one else's permanently living there. Given the remark's reliance on this evidence, it was not inconsistent with the quoted jury instructions. *See Figueroa*, 250 S.W.3d at 502 (applying "care, custody, or control of the contraband" definition of possession); *Stubblefield*, 79 S.W.3d at 173, 178 (applying "care, custody, and control of the substance" definition of possession and concluding that evidence was "strong" that defendant "was aware the drugs were present").

We therefore hold that the trial court would not have erred by overruling the misstatement-of-law objection that Swan claims his counsel should have made. *See Ex parte White*, 160 S.W.3d at 53; *West*, 474 S.W.3d at 790. His first sub-issue thus does not support ineffective assistance. *See Browne*, 483 S.W.3d at 199. We overrule the first sub-issue.

## II.     Failure to object to alleged hearsay during K.L.'s punishment testimony

In his second sub-issue, Swan contends that counsel should have made hearsay objections to parts of K.L.'s punishment testimony. She testified about the sexual offenses for which the State indicted Swan but which the State had not yet prosecuted, instead saving them for the punishment phase of this case.

The standards for reviewing alleged ineffective assistance during the punishment phase are generally the same as those for guilt–innocence. *West*, 474 S.W.3d at 794 (citing *Hernandez v. State*, 988 S.W.2d 770, 771 (Tex. Crim. App. 1999)). Failure to object to admissible evidence offered during punishment is not ineffective assistance. *Grey v. State*, 299 S.W.3d 902,

11

911 (Tex. App.—Austin 2009, pet. ref'd); *Lee v. State*, 29 S.W.3d 570, 579–80 (Tex. App.—Dallas 2000, no pet.). We assume without deciding that hearsay is generally inadmissible during the punishment phase of a non-capital trial along similar lines as those in the guilt–innocence phase. *See Macedo v. State*, 609 S.W.3d 342, 346–49 (Tex. App.—Houston [14th Dist.] 2020, pet. granted) (reviewing case law and rejecting contrary conclusion, that hearsay rules do not apply during punishment, from *Montoya v. State*, No. 08-17-00196-CR, 2019 WL 5288369 (Tex. App.—El Paso Oct. 18, 2019, pet. ref'd) (mem. op., not designated for publication)).

An alleged erroneous admission of evidence during punishment is reviewed for an abuse of discretion. *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). A trial court abuses its discretion only when its decision lies outside the "zone of reasonable disagreement." *Id.* An admission of evidence must be upheld if any valid legal theory supports it and if the theory is supported by the record, even if the theory is not one on which the trial court itself relied. *See State v. Esparza*, 413 S.W.3d 81, 85 & n.17 (Tex. Crim. App. 2013); *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005); *Miles v. State*, 488 S.W.2d 790, 792 (Tex. Crim. App. 1972).

In the punishment phase, for the jury to consider evidence of an extraneous crime for which the defendant could be held criminally responsible, the State must prove the defendant's involvement in the extraneous crime beyond a reasonable doubt. *See* Tex. Code Crim. Proc. art. 37.07, § 3(a)(1); *Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005). The jury charge here instructed the jury consistently with this rule.

Swan raises seven instances of alleged hearsay during K.L.'s testimony that he argues his counsel should have objected to. They are K.L.'s statements about:

12

(1) the two girls' first meeting D—that F.T. said "that she was talking to somebody whenever [K.L.] woke up" and "that [F.T.] had met a guy and that he had a lot of money, and . . . that we could go with him";

(2) interacting with D—that "he told us about all the girls that live with him" and that she learned "what D is about" because he talked to F.T. "about it and she told" K.L.;

(3) D's wanting F.T. but not K.L. to be a prostitute "[b]ecause [F.T.] told him that [K.L.] was 17 when [K.L.] was 16 and so [K.L.] couldn't do anything" and that D "didn't want to get in trouble for that";

(4) F.T.'s lying to D about her age and her saying that "she didn't want to prostitute";

(5) F.T.'s telling K.L. about how she met Swan in the hotel parking lot;

(6) how F.T. felt scared when D kicked the two girls out; and

(7) how F.T. told K.L. that F.T. and Swan "did anal."

The State argues that the first five instances were admissible because K.T.'s statements were not offered to prove the truth of the matters asserted in the statements. Instead, the State says, the statements were all offered simply for their effects on F.T. and K.L. Those effects led the girls to travel to Austin with D, to leave D once in Austin, and to meet and stay with Swan. The trial court reasonably could have concluded that these statements were admissible over a hearsay objection because they were offered for their effects on the listener rather than for their truth—the statements set the stage for how the girls met Swan and did not address Swan's alleged acts of sexual assault. *See McNeil v. State*, 452 S.W.3d 408, 419 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *Young v. State*, 10 S.W.3d 705, 712 (Tex. App.—Texarkana 1999, pet. ref'd).

Instance six—K.L.'s statement about F.T.'s state of fear after D kicked the girls out—is a statement about F.T.'s then-existing mental or emotional condition and was not concerned with Swan's alleged acts of sexual assault. It instead concerned F.T.'s state of mind

13

just before meeting Swan. The trial court therefore reasonably could have concluded that the statement was admissible over a hearsay objection. *See Martinez v. State*, 17 S.W.3d 677, 688 (Tex. Crim. App. 2000); *Peña v. State*, 864 S.W.2d 147, 149–50 (Tex. App.—Waco 1993, no pet.).

Instance seven—F.T.'s statement to K.L. that F.T. and Swan "did anal"—was not the only evidence about Swan's alleged penetration of F.T.'s anus. Other witnesses for the State testified later about recovering male DNA from the anal and buttocks swabs taken from F.T. and that the male DNA was very likely Swan's. Because the later-admitted evidence allowed the jury reasonably to conclude beyond a reasonable doubt that Swan penetrated F.T.'s anus, we conclude that he has not shown that counsel's failure to object to hearsay this time had a "substantial, not just conceivable," effect on the jury's sentence of 70 years. *See Bazan v. State*, 403 S.W.3d 8, 13 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (citing *Harrington v. Richter*, 562 U.S. 86, 112 (2011)); *see also Blumenstetter v. State*, 135 S.W.3d 234, 250–51 (Tex. App.—Texarkana 2004, no pet.) (appellant failed to show required prejudice stemming from counsel's failure to object to certain evidence because that evidence was cumulative of other evidence so that "the results of the proceeding would not have been different had defense counsel objected"); *Marlow v. State*, 886 S.W.2d 314, 318 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) ("[A]ppellant's own testimony contained essentially the same information. The evidence was cumulative and its admission was harmless. Appellant has failed to show prejudice from trial counsel's failure to object to this evidence."); *Miranda v. State*, 391 S.W.3d 302, 312 (Tex. App.—Austin 2012, pet. ref'd) (evidence of assailant's DNA from anal and vaginal swabs supplied evidence of assailant's having penetrated victim's anus and vagina).

For each of the seven instances of alleged hearsay, then, Swan has failed to make the required showings under both *Strickland* prongs. We overrule his second sub-issue.

14

**III.** **Failure to object to alleged hearsay during the SANE's punishment testimony**

In his third sub-issue, Swan contends that counsel should have made hearsay objections to parts of the punishment testimony by the SANE who examined K.L. Swan's arguments concern two instances of alleged hearsay: (1) the SANE's reading from medical records about the examination, which, Swan argues, included "narrative . . . from before K.L. met [Swan], how it came about [that] she met [Swan], and his identity," and (2) statements about K.L.'s fears.

The SANE's testimony about the medical records involved why she takes the patient history that she documents in the records and what K.L. revealed in her patient history. The SANE testified that the exam is "both a medical exam and then a forensic with a forensic component." She takes the patient history to "learn about the assault and what happened," and she took K.L.'s history in part while the exam was progressing. The SANE's questions to K.L. during the exam involved asking the teenager about any pain so that the SANE could recommend treatments—either medication or hospitalization—because, "first and foremost," the SANE considers herself "a nurse so [she] care[s] for a patient."

Then when testifying about the content of K.L.'s history, the SANE read from her medical records. She relayed that K.L. said of Swan, "He kept trying to do stuff with us," and that the two girls "would say, no, dude, don't touch me, and he would still do it." When the SANE asked K.L. to clarify, K.L. responded that she was referring to Swan wanting to "have sex with us." The SANE also relayed how Swan asked the two girls if they knew what handlebars were, referring to a drug, but that the girls thought he simply meant the handlebars on a bicycle. Finally, the SANE relayed specific statements of K.L.'s about Swan's assaults:

> I'm pretty sure every single day since Sunday he touched us and had sex with us.
> He didn't want it anymore yesterday because I was on my period. I was like, thank

15

God. But I know he had sex with her, points in the direction of the room where [F.T.] is in. I woke up and I saw them having sex.

Swan argues that all this testimony was hearsay.

By contrast, the State argues that the patient history was admissible over a hearsay objection, and we agree that the trial court reasonably could have so concluded. "A statement that: (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause" is "not excluded by the rule against hearsay." Tex. R. Evid. 803(4). The SANE's testimony about the medical-treatment purposes and uses of taking patient histories, including K.L.'s, supplied the trial court with a reasonable basis to conclude that K.L.'s history was admissible under Rule 803(4). *See Gutierrez v. State*, __ S.W.3d __, No. 11-18-00298-CR, 2020 WL 6791050, at *6–7 (Tex. App.—Eastland Nov. 19, 2020, pet. ref'd) (op., designated for publication); *Franklin v. State*, 459 S.W.3d 670, 677–78 (Tex. App.—Texarkana 2015, pet. ref'd); *Fleming v. State*, 819 S.W.2d 237, 247 (Tex. App.—Austin 1991, pet. ref'd) (per curiam).

As for the testimony about K.L.'s fears, the SANE testified that K.L. "was fearful for her own death and she feared her own physical injury" when with Swan; that she thought her situation "iffy because you don't know people and what they'll do, especially if you do something that they don't like"; and that she also feared for F.T.'s death or physical injury. The trial court reasonably could have concluded that these statements were admissible over a hearsay objection as statements of then-existing mental or emotional conditions. *See Martinez*, 17 S.W.3d at 688; *Peña*, 864 S.W.2d at 149–50.

For these instances from the SANE's testimony, then, Swan has failed to make the required showing under the first *Strickland* prong. We overrule his third sub-issue.

16

**IV.    Failure to object to allegedly improper jury argument during punishment phase**

In his fourth sub-issue, Swan contends that his counsel was ineffective for failing to object to the prosecutor's allusion to Al Capone during punishment jury argument. The prosecutor compared the State's decision to prosecute Swan only for the drug offense to prosecuting Al Capone only for tax evasion:

> It might seem a little bit underhanded to you or you might be confused why we brought a drug charge if what we're really after is the sexual assault. Sometimes you got to get Al Capone on tax evasion. This is what we can do. This is what we have done. Now it is your part.

The record does not reflect why counsel did not object, and there is at least a possibility that not objecting was legitimate trial strategy. *See Garza*, 213 S.W.3d at 348; *Robertson*, 187 S.W.3d at 482. For example, counsel sometimes may legitimately choose not to object to improper argument and to instead respond during counsel's own jury argument, which Swan's counsel got the chance to do here. *See Ex parte Scott*, 541 S.W.3d 104, 121–22 (Tex. Crim. App. 2017). Choosing not to object during jury argument can be a reasonable strategy also when counsel's overall strategy is a plea for leniency, which too much objecting would undercut. *See id.* at 124–25. We also do not find that counsel's failure to object was so outrageous that no competent attorney would have done the same. *See Goodspeed*, 187 S.W.3d at 392. We therefore conclude that Swan has not made the required ineffective-assistance showings and overrule his fourth sub-issue.

17

**CONCLUSION**

We affirm the trial court's judgment.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Baker and Kelly

Affirmed

Filed:   May 4, 2021

Do Not Publish