**Opinion issued February 1, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00687-CR

———————————

**EMILIANO ROMERO PADILLA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 228th District Court**
**Harris County, Texas**
**Trial Court Case No. 1681498**

## MEMORANDUM OPINION

Appellant Emiliano Romero Padilla was convicted of the offense of aggravated sexual assault of a child.[1]  In one issue, Padilla asserts that he received ineffective assistance of counsel.  We affirm.

## Background

On July 6, 2020, the complainant, C.F., who was nine at the time, and her nineteen-year-old brother, P.F. ("Brother"), were at home with Padilla, who was their mother's boyfriend.[2]  Their mother was at work.  That evening, Brother testified he made C.F. dinner and, when she was finished eating, C.F. went to her room.  Padilla, who had been sitting with C.F. and Brother at the dining room table, stayed at the table, and Brother went into the living room to watch videos on his phone.  After a few minutes, Brother testified he noticed that the house was "too quiet," so he went to check on C.F.  On his way to C.F.'s room, he noticed that Padilla was no

---

[1]     *See* TEX. PENAL CODE § 22.021(a)(1)(B)(iii), (a)(2)(B).

[2]     As is our common practice, we refer to the complainant and her family members by their initials or pseudonyms for their privacy. *See Ingerson v. State*, 559 S.W.3d 501, 503 n.3 (Tex. Crim. App. 2018); *Jenkins v. State*, No. 01-18-00987-CR, 2020 WL 1679697, at *1 n.3 (Tex. App.—Houston [1st Dist.] Apr. 7, 2020, pet. ref'd) (mem. op., not designated for publication); *see also* TEX. CONST. art. I, § 30(a)(1) (providing that "crime victim has . . . the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

longer in the dining room. When he came to C.F.'s room, he saw that her door, which was usually always open, was partially closed.

Brother testified that, when he opened the door and walked into the room, he saw C.F. lying on her back on the bed with her legs up in the air while Padilla knelt in front of the bed with his face between C.F.'s legs, and his mouth on C.F.'s vagina. C.F. was wearing only a shirt, she had no pants on, and she looked scared. Brother told C.F. to put on her pants, then he grabbed her and ran out of the house. Brother carried C.F., who did not have shoes on, out of the house and called 9-1-1. Brother stayed on the phone with the 9-1-1 operator until the police arrived and described what he had seen to the operator. Brother's 9-1-1 call was admitted as State's Exhibit 9 at trial and was played for the jury. On the call, Brother provided the details of the sexual assault and his actions on that night, which was consistent with his testimony at trial.

When officers from the Friendswood Police Department arrived, Officer S. McCaffrey stayed with C.F. and Brother while Sergeant D. Wilkerson and his partner knocked on the front door of Padilla's house. Sergeant Wilkerson testified that he knocked on Padilla's front door, which was slightly opened, and could hear someone moving around inside. It took Padilla a few minutes to answer the door, and when he finally opened the door, his hair was wet, and he stated he had just gotten out of the shower. When Sergeant Wilkerson and his partner explained that

3

Brother had called 9-1-1 and reported that Padilla was "inappropriately touching" C.F., Padilla said "no, I don't think so" and claimed that Brother had misinterpreted the situation. Padilla claimed that he was giving C.F. a hug from the side of the couch in the living room, and that he did not know why Brother would make something like that up.

After speaking with Padilla, Sergeant Wilkerson testified that he placed Padilla into custody and transported him to jail. Police officers then contacted C.F.'s Mother at work to tell her what had happened. When she arrived at Padilla's house, she consented to a search of the house. During the search, police officers collected the sheets from C.F.'s bed and clothing in Padilla's bathroom. C.F.'s older sister arrived on scene and C.F. told her that "this was not the first time" this had occurred.

That night, C.F. was taken to Texas Children's Hospital for a sexual assault examination. The examination was conducted by Tuesday Sowers, a registered nurse and certified sexual assault nurse examiner ("SANE"). During the examination, Sowers testified that C.F. told her Padilla had touched her "private parts" last night with his mouth. When asked if this was the first time this had happened, C.F. said "yes." As part of the examination, Sowers collected evidence, including swabs and C.F.'s underwear for DNA analysis.

On August 7, 2020, C.F. was forensically interviewed by the Children's Assessment Center. During the interview, C.F. disclosed a "couple different"

4

instances of sexual abuse by Padilla, "the main one was the oral penetration of her vagina by [Padilla's] mouth and tongue." Based on C.F.'s disclosures in her interview and sexual assault examination, Detective W. Higgs, the detective assigned to investigate C.F.'s case, testified that he obtained a warrant for Padilla's DNA. The DNA evidence collected from Padilla was submitted for DNA testing and comparison with the evidence and swabs that were collected from C.F.

During trial, C.F., who was then eleven years old, testified that Padilla first began touching her "private parts" when she was eight.[3] C.F. described five incidents that occurred before the charged incident, including one that took place when she was eight, where Padilla began to pull down her underwear with his hand while she was sitting on his lap. C.F. told her mother about this incident, but her mom "said that [Padilla] was probably doing something else," and C.F. did not feel like her mom believed her.[4]

C.F. also testified that on evening of the offense she came out of her bedroom and saw Padilla sitting in the dining room. She said that Padilla gestured with his

---

[3] C.F. testified that she has two private parts on her body that no one is supposed to touch. The bottom part, where pee comes out, and her chest.

[4] The four other incidents involved Padilla tickling C.F. on the stomach with his mouth, touching her buttocks over her clothing, touching her chest with his hand, and touching her "private part" that pee comes out of with his mouth over her clothes. C.F. testified that, after these incidents, Padilla told C.F. not to tell anyone or "put his finger on his mouth, like to don't tell."

finger for her to come to him and she shook her head no. Padilla told C.F. to go with him, and she again shook her head no. Padilla then walked toward C.F., picked her up "like a little baby," brought her to her bedroom, and put her on her bed. Padilla closed her bedroom door "a little bit," and then took off C.F.'s pants and underwear. While C.F. was lying on her back on the bed, Padilla held her legs up in the air, "separating them," and "started putting his mouth on [her] private part." C.F. testified that she remembered feeling Padilla's tongue "licking [her] private part." She testified that this last for about five minutes, before Brother walked in.

After Brother walked in, Padilla covered C.F.'s private part with a pillow and "made a sign to not tell" before he walked out of the room. Brother told C.F. to put her pants back on, and she and Brother went outside. She testified that she was not wearing any shoes, so Brother gave her his shoes to wear. They walked to the corner of the street and waited for police.

Diane Donley, a DNA analyst at the Harris County Institute of Forensic Sciences, testified that she conducted DNA analysis on the evidence collected in this case. Donley testified that once she obtained a known saliva sample from Padilla, she compared that known sample to portions of C.F.'s underwear. She testified that, for area C of the underwear, which was taken from inside the crotch of the

6

underwear, a sperm fraction test[5] was conducted, and the DNA results obtained were consistent with a mixture of DNA from three individuals. Donley testified that it was 163 trillion times more likely that the DNA mixture came from C.F., Padilla, and an unknown individual rather than from the complainant and two unknown individuals. She explained that this "likelihood ratio of 163 trillion times . . . provid[es] very strong support for the proposition that [Padilla] is a contributor to the DNA obtained from . . . the inside of the crotch" of C.F.'s underwear.

Donley testified that she was not able to identify the third contributor because she did not have any other known DNA samples to use for comparison. However, she explained that the DNA could have been from transferred skin cells that were deposited on the underwear by touch, or there from sperm cells or saliva.

---

[5]    Donley explained that when she is testing a sample for semen, "the sample will undergo a differential extraction and during that extraction, two fractions will occur at the end from one sample." One will be the non-sperm fraction and the other is the sperm fraction. She stated that, ideally, any male DNA that may be in the sample will be isolated into the sperm fraction and the female DNA will be isolated into the non-sperm fraction. But she explained that it is not always possible to isolate male DNA from females, and they may obtain a mixture in the refraction. Donley also explained that although it is called a "sperm fraction," that does not definitively mean that sperm is present. "It's just how the fraction is named but we are isolating any male DNA from sperm that may be present but it is not indicative that it is present." A separate test, a serology test, can be utilized to confirm the presence of sperm.

The jury found Padilla guilty of aggravated sexual assault of a child. Following the punishment phase, the trial court sentenced Padilla to 35 years in prison.

## Ineffective Assistance of Counsel

In his sole issue, Padilla points to several alleged errors committed by his trial counsel that he contends, when reviewing the totality of the representation, resulted in an overall deficient performance. Padilla acknowledges that this is not a case where he can "point to a particular mistake made by trial counsel, and the ramifications of that singular error." But considering the totality of the record, he maintains that his trial counsel's representation was plainly ineffective.

The legal analysis for an ineffective assistance of counsel claim requires us to consider the totality of counsel's representation.[6] To the extent Padilla argues that we must look to trial counsel's performance as a whole and not consider whether each of the alleged errors, in isolation, amounts to ineffective assistance, we disagree. Rather, if none of the alleged actions alone constitutes error—then such non-errors taken together cannot "in their cumulative effect cause error."[7] Accordingly, we address each alleged error in turn.

---

[6]     *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

[7]     *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); *see also Straight v. State*, 515 S.W.3d 553, 576 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) ("Having concluded that trial counsel did not render ineffective assistance in

## A.    Standard of Review

The United States Constitution, Texas Constitution, and Texas Code of Criminal Procedure guarantee an accused the right to assistance of counsel. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. art. 1.051. As a matter of state and federal law, this right includes the right to reasonably effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Ex parte Gonzales*, 945 S.W.2d 830, 835 (Tex. Crim. App. 1997).

To prevail on a claim of ineffective assistance of counsel, an appellant must prove by a preponderance of the evidence that (1) counsel's performance fell below an objective standard of reasonableness and that (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). A failure to make a showing under either prong of the *Strickland* test defeats a claim for ineffective assistance. 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."); *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

appellant's complained of actions, we likewise conclude that the cumulative effect of trial counsel's actions does not amount to ineffective assistance.").

Under *Strickland*'s first prong, we must look to the totality of the representation to determine the effectiveness of counsel—indulging a strong presumption that counsel's performance fell within the wide range of reasonable professional assistance and was motivated by sound trial strategy. 466 U.S. at 689; *Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006). We "must be highly deferential to trial counsel and avoid the deleterious effects of hindsight." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel." *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

Allegations of ineffectiveness must be firmly founded in the record. *Thompson*, 9 S.W.3d at 813–14. In most cases, a direct appeal is an inadequate vehicle for raising an ineffective assistance claim because the record is undeveloped, and a silent record cannot adequately reflect the motives behind trial counsel's actions. *See Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003); *see also Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

When, as here, the record does not reveal the reasons for trial counsel's actions, we "will assume a strategic motivation if any can possibly be imagined." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). Trial counsel should generally have an opportunity to explain his or her actions before we find the

10

performance deficient. *Goodspeed*, 187 S.W.3d at 392. Without that opportunity, we should not find trial counsel's performance deficient "unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *Garcia*, 57 S.W.3d at 440).

In rare cases in which counsel's ineffectiveness is apparent from the record, an appellate court may address the claim on direct appeal. *Lopez*, 343 S.W.3d at 143. But "the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Id.*

Under *Strickland*'s second prong, we must determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* That an error had "some conceivable effect on the outcome" will not suffice. *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010). Rather, there must be a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt with respect to guilt. *Id.*

## B.     Pre-trial Motions

Padilla first directs this Court to his trial counsel's alleged deficiencies related to pre-trial motions.  Padilla argues that his trial counsel filed only a small number of pre-trial motions, including two motions for a hearing outside the presence of the jury and a motion in limine.  According to Padilla, his trial counsel never requested a ruling on these motions.  The only motion on which trial counsel received a ruling was a motion to transfer.

We first note that, like any other claim, an ineffective-assistance claim must be properly briefed to present the issue for appellate review. *See* TEX. R. APP. P. 38.1.  Thus, a party who fails to support an ineffective-assistance claim with supporting citations to authority waives the claim. *See Nanez v. State*, 346 S.W.3d 875, 876 (Tex. App.—Amarillo 2011, no pet.); *Tufele v. State*, 130 S.W.3d 267, 270–71 (Tex. App.—Houston [14th Dist.] 2004, no pet.).[8]

Padilla cites to no legal authority to support his arguments related to his trial counsel's acts or omissions in filing only a small number of pre-trial motions and failing to obtain rulings on those motions.  Nor does he explain how his trial counsel's acts or omissions related to the pre-trial motions constitute deficient

---

[8]     *See also Gutierrez v. State*, No. 01-17-00734-CR, 2019 WL 5606627, at *7 (Tex. App.—Houston [1st Dist.] Oct. 31, 2019, no pet.) (mem. op., not designated for publication).

12

performance or how he was harmed by these specific acts or omissions.[9]  Thus, we conclude that Padilla waived his ineffective-assistance-of-counsel argument related to pre-trial motions. *See Gutierrez v. State*, No. 01-17-00734-CR, 2019 WL 5606627, at *7 (Tex. App.—Houston [1st Dist.] Oct. 31, 2019, no pet.) (mem. op., not designated for publication); *Nanez*, 346 S.W.3d at 876; *Tufele*, 130 S.W.3d at 270–71.

But, even if this argument were not waived, we would still conclude that, based on the record before us, Padilla failed to demonstrate that his trial counsel's performance was constitutionally deficient.  Failure to file pre-trial motions does not result in ineffective assistance of counsel because trial counsel may decide not to file pre-trial motions as part of his trial strategy. *See Martinez v. State*, 449 S.W.3d 193, 208 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).  "If [a] failure to file pre-trial motions is not ineffective assistance, it necessarily follows that failing to obtain a ruling is also not ineffective assistance." *Wills v. State*, 867 S.W.2d 852, 857 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd).  Furthermore, unless an appellant shows that the pretrial motion had merit and that a ruling on the motion would have

---

[9]     *See Nanez v. State*, 346 S.W.3d 875, 876 (Tex. App.—Amarillo 2011, no pet.) ("[N]either appellant nor his appellate attorney provided us with statutory or case citation purporting, in any way, to illustrate that the particular conduct of which they complained was unreasonable or deficient.  Omitting such authority alone permits us to deem the issues inadequately briefed and, therefore, waived.").

changed the outcome of the case, counsel will not be ineffective for failing to assert the motion. *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998).

Further, Padilla filed a motion for new trial but did not raise this ineffective-assistance argument. Accordingly, the record is silent as to trial counsel's strategy for pursuing (or not pursuing) a particular pretrial motion and we must presume that trial counsel's performance was not deficient on this ground. *See Lopez*, 343 S.W.3d at 143.[10] He likewise raises no argument that had any of the pretrial motions filed been ruled on, the outcome of the case would have changed. We therefore conclude that Padilla has failed to satisfy either *Strickland* prong and, thus, he has failed to demonstrate that defense counsel's actions with respect to the filing of this motion were constitutionally deficient. *See Strickland*, 466 U.S. at 697; *Williams*, 301 S.W.3d at 687.

## C. Jury Selection

Padilla next argues that his trial counsel "rendered plainly ineffective assistance during the voir dire phase of trial" by failing to object to certain statements made by the prosecutor during voir dire. According to Padilla, the prosecutor's statement that "around one in four girls and one in six boys experience some type of

---

[10] *See also Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (in cases where record silent as to trial counsel's reasoning, appellate court should find ineffective assistance only if challenged conduct so outrageous that no competent attorney would have engaged in it).

sexual abuse in their lifetimes" was improper, and should have been objected to, because there was no evidence before the jury as to this fact and the statement could serve no purpose but to inflame the jury. Next, he argues the prosecutor's statement that if "the defendant is found not guilty, he'll be free to leave. He'll get on that elevator with you and walk out of the courtroom," was improper and intended to frighten the jury pool.

As with his argument related to pre-trial motions, Padilla fails to cite any legal authority to support his arguments that the prosecutor's above statements were improper, that the failure to object to those statements amounted to deficient performance, or that the failure to object to those statements harmed him. Accordingly, we conclude that Padilla waived his ineffective assistance of counsel argument related to voir dire. *See Gutierrez*, 2019 WL 5606627, at *7; *Nanez*, 346 S.W.3d at 876; *Tufele*, 130 S.W.3d at 270–71.

But, even if these contentions were not waived, we still conclude that based on the record before us, Padilla failed to demonstrate that his defense counsel's performance was constitutionally deficient. In that regard, the record contains no indication why Padilla's trial counsel chose not to object. To find trial counsel ineffective would call for speculation, which we will not do. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); *Garcia v. State*, 106 S.W.3d 854, 860 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). Further, the rationale, if any, for

15

that decision was not explored at trial, and the issue was not raised in a motion for new trial. "Trial counsel 'should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.'" *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (quoting *Goodspeed*, 187 S.W.3d at 392). "If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *Goodspeed*, 187 S.W.3d at 392).

Here, the record is silent on trial court's reason for not objecting, and her failure to object to the prosecutor's two remarks is not so outrageous as to warrant speculation into the matter. Thus, we must presume that counsel's performance was not deficient on this ground. *See Lopez*, 343 S.W.3d at 143; *see also Goodspeed*, 187 S.W.3d at 392.

### D. Failure to Object at Trial

Padilla next argues that his trial counsel rendered ineffective assistance by failing to object to various pieces of evidence at trial. "When an ineffective assistance claim alleges that counsel was deficient in failing to object to the admission of evidence, the defendant must show, as part of his claim, that the

evidence was inadmissible." *Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002).[11]

### 1.    *Sexual Assault Examination Report*

Padilla first argues that his trial counsel rendered ineffective assistance by failing to object to the admission of C.F.'s sexual assault examination report, conducted by Tuesday Sowers, because it contained hearsay statements of C.F. Padilla acknowledges the Rule 803(4) exception to the hearsay rule for statements made for medical diagnosis and treatment but argues that this exception does not apply here because the complainant was not seeking medical diagnosis or treatment; rather, this was a forensic examination requested by police. Thus, Padilla argues that this evidence was inadmissible, and his trial counsel was ineffective for failing to object to it.

Hearsay—a statement not made by the declarant while testifying at trial that a party offers into evidence for the truth of the matter asserted—is generally inadmissible. TEX. R. EVID. 801(d), 802. However, this general prohibition does not bar a statement made for and reasonably pertinent to medical diagnosis or treatment that "describes medical history; past or present symptoms or sensations; their

---

[11]    *See also Prine v. State*, 537 S.W.3d 113, 117–18 (Tex. Crim. App. 2017) ("The failure to object will not support a claim of ineffective assistance unless the trial judge would have erred in overruling the objection.").

17

inception; or their general cause." TEX. R. EVID 803(4)(A)–(B). This exception may encompass medical records documenting the sexual abuse of children. *See, e.g.*, *Sandoval v. State*, 52 S.W.3d 851, 856–57 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (trial court did not err in admitting medical records in their entirety).

Sowers is a registered nurse who is certified as a sexual assault nurse examiner (SANE) through the Office of the Attorney General in Texas. Sowers explained that when she conducts a SANE exam on a child or adolescent, she takes a "detailed history of what has occurred," conducts a "head-to-toe assessment assessing for trauma and injuries," followed by a "detailed ano-genital exam assessing for injury or trauma," and finally, if needed, she collects and preserves evidence. Sowers testified that it is important to collect a medical history from the child so that she "can come up with a medical diagnosis."

Sowers testified that she examined C.F. in the early morning hours of July 7, 2020. As part of her examination, Sowers completed a five-page report. The report included C.F.'s relevant medical history, her description of the alleged abuse, the results of Sowers' physical examination of C.F., and Sowers' impressions. Sowers stated in her report that the "[h]ead to toe exam reveals no acute trauma or injuries" and that the "[a]no-genital exam reveals no acute trauma or injuries." This report was admitted into evidence as part of Exhibit 10, with no objection from Padilla's trial counsel. During her testimony, Sowers referred to C.F.'s statements related to

18

her description of the alleged abuse that were contained in the report, including her statements that Padilla touched her private part with his mouth.

We disagree with Padilla's contention that Sowers' sexual assault examination of C.F. was part of a criminal investigation and not made for the purpose of medical diagnosis or treatment, and therefore, inadmissible under Rule 803(4). In fact, we have previously rejected this precise argument. *See Martinez v. State*, No. 01-15-00823-CR, 2016 WL 6803233, at *11–12 (Tex. App.—Houston [1st Dist.] Nov. 17, 2016, pet. ref'd) (mem. op., not designated for publication). In *Martinez*, we reiterated that the purpose of these sexual assault examinations is to ascertain whether the child was sexual abused and whether the child needs medical attention. *See id.* (citing *Sandoval*, 52 S.W.3d at 857).[12] And, we held that the pediatric nurse's sexual assault examination report, containing among other things the complainant's description of the alleged abuse, was prepared for the purpose of ascertaining whether the child was sexually abused and whether the child needed medical attention and was therefore admissible under Rule 803(4). *Id.*

As demonstrated by Sowers' testimony in this case, and contents of her report, the purpose of the exam was to obtain a "detailed history of what has occurred" and

---

[12] *See also Beheler v. State*, 3 S.W.3d 182, 189 (Tex. App.—Fort Worth 1999, pet. ref'd) (holding that, because "[t]he object of a sexual assault exam is to ascertain whether the child has been sexually abused and to determine whether further medical attention is needed[,] . . . statements describing acts of sexual abuse are pertinent to the victim's medical diagnosis and treatment").

19

assessment of the child for injuries and trauma, in order to come up with a medical diagnosis and treat any injuries. Because Padilla has not shown that the sexual assault examination report was inadmissible, he has not demonstrated that trial counsel was deficient for failing to object. *See Ortiz*, 93 S.W.3d at 93. Thus, Padilla has failed to satisfy the first prong of *Strickland*.[13]

### 2. *Statements by Prosecutor Presuming Guilt of Accused*

Padilla next asserts that his trial counsel failed to object to questions by the prosecutor that "presumed the guilt of the accused." Specifically, Padilla asserts that the prosecutor's question to Friendswood Police Department Sergeant D. Wilkerson, "did you come to learn in which room the abuse occurred," was deficient because the officer did not witness the alleged offense or have any knowledge if any abuse had been committed.

As with many of Padilla's other arguments, he cites no legal authority to support his argument that this question and the elicited response were inadmissible

---

[13] Even if this evidence were inadmissible and the failure to object constituted deficiency, Padilla cannot satisfy the second prong of *Strickland* because C.F.'s statements in the sexual assault examination report describing the alleged assault was cumulative of other properly admitted evidence at trial, including the testimony of C.F. and Brother. *See McNeil v. State*, 452 S.W.3d 408, 419–20 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (admission of hearsay evidence was cumulative and its admission harmless and, therefore, lack of objection to hearsay evidence was not ineffective assistance).

and, thus, that trial counsel's failure to object was deficient. Nor does he identify a specific objection that trial counsel should have made but did not.

But even assuming that this evidence was inadmissible and that trial counsel's failure to object was deficient, Padilla cannot satisfy the second prong of *Strickland* because the officer's response that the abuse occurred in C.F.'s bedroom was cumulative of other properly admitted evidence at trial. *See McNeil v. State*, 452 S.W.3d 408, 419–20 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). For instance, both C.F. and Brother testified that the sexual assault occurred in C.F.'s bedroom.

C.F. testified that Padilla carried her to her bedroom, closed the door, and placed her on her back on her bed. She testified that Padilla removed her pants and underwear, spread her legs apart, and placed his tongue on her "private part." C.F. testified that Padilla "lick[ed] [her] private part" for about five minutes, until her brother walked in. Brother similarly testified that he walked into C.F.'s bedroom and saw C.F. lying on her back on the bed with her legs up in the air while Padilla knelt in front of the bed with his mouth on C.F.'s vagina.

Because the unobjected-to evidence was cumulative, any error in its admission was harmless. Thus, Padilla cannot show that the lack of objection constituted ineffective assistance. *See id.*

## E. Closing Argument

Padilla next asserts that his trial counsel "abandoned her role as an advocate for the accused" during closing argument, though he concedes this was not "the most damaging to [his] case." Padilla argues that by telling the jury to take her argument "with a grain of salt," his trial counsel was essentially washing her hands of her client. He also argues that trial counsel essentially apologized for representing her client, by saying:

> So it's up to you to decide what happened. To what extent can I say to you it didn't happen? I don't know. I wasn't there. I heard the evidence and I will always go in favor of my client and I will ask you to find the defendant not guilty.

Finally, Padilla asserts that his trial counsel should have, but did not, mention the "critical" inconsistencies between C.F.'s and Brother's testimony.[14] Rather, he contends that trial counsel only made a "futile argument that runs contrary to the

---

[14] Some of the "critical" inconsistencies Padilla points out include:

- C.F.'s testimony that she did not eat the night of the assault; Brother's testimony that he made dinner for C.F.

- C.F.'s testimony that Padilla sat by himself eating at the dining table; Brother's testimony that Padilla did not eat but was drinking.

- C.F.'s testimony that Padilla came home from work on the night of the assault; Brother's testimony that Padilla was not working at the time of the assault.

Padilla does not point to any inconsistencies between C.F.'s testimony related to the assault itself and what Brother testified that he witnessed.

22

evidence," i.e., that Brother was angry at Padilla and did not want to live with him.[15]

Padilla contends that if these omissions do not constitute ineffective assistance of counsel, "it is difficult to imagine what could."

The right to effective assistance of counsel encompasses closing arguments of the defense. *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003). Closing arguments involve inherently tactical decisions that must be tailored to the strategy of the defense based on events that transpired during trial. *Id.*; *Ex parte Scott*, 541 S.W.3d 104, 119 (Tex. Crim. App. 2017). Accordingly, deference to counsel's strategic decisions during closing arguments is particularly important because of the wealth of legitimate strategies that can be employed, and those decisions will be second-guessed only if there is no plausible basis for the attorney's actions. *Yarborough*, 540 U.S. at 6; *Scott*, 541 S.W.3d at 119.

Again, we note that Padilla fails to cite to any legal authority to support his argument that trial counsel's statements (or omissions) during closing argument were deficient. And although Padilla filed a motion for new trial in this case, he did not assert this ineffective assistance argument in that motion and, therefore, the

---

[15] As the State pointed out, this argument was not contrary to the evidence as Padilla suggests. During cross-examination, Brother agreed that he was not happy that he had to move in with Padilla and explained that he "had no choice." He also characterized his relationship with Padilla as "okay" and conceded during cross-examination that he never had a "close relationship" with Padilla and that they "just didn't cross paths."

23

record is silent as to his trial counsel's specific strategy during closing argument. *See Menefield*, 363 S.W.3d at 592–93.[16]

Furthermore, attempting to persuade a jury to convict a defendant of a lesser-included offense or even conceding the defendant's guilt has been held to constitute a reasonable trial strategy. *See Hathorn v. State*, 848 S.W.2d 101, 118 (Tex. Crim. App. 1992); *Guzman v. State*, 539 S.W.3d 394, 408–09 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).[17] Likewise, courts have concluded that in some circumstances, trial counsel's decision to forego closing argument entirely is not ineffective assistance of counsel. *See Yarborough*, 540 U.S. at 6; *Forge v. State*, No. 13-13-00120-CR, 2013 WL 7864083, at *4 (Tex. App.—Corpus Christi–Edinburg Dec. 5, 2013, no pet.) (mem. op., not designated for publication) (noting that trial counsel "may have chosen not to make a closing argument urging a lesser sentence because that may have led the prosecutor to invoke *his* right to make a closing

---

[16] *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003) ("[T]rial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective."); *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) ("Ineffective assistance of counsel claims are not built on retrospective speculation; they must 'be firmly founded in the record.'").

[17] *See also Jordan v. State*, 859 S.W.2d 418, 421–22 (Tex. App.—Houston [1st Dist.] 1993, no pet.) ("It is logical to conclude that trial counsel, faced with overwhelming evidence of [defendant]'s guilt, chose to placate the jurors rather than to possibly antagonize them with an impassioned, though weakly supported, plea for a verdict of not guilty.").

argument, which may have resulted in a harsher sentence" and, thus, rejecting appellant's argument of ineffective assistance).

Here, Padilla's trial counsel did not go so far as to forego closing argument entirely or concede guilt. Rather, instead of focusing on minor inconsistencies between witness testimony, she chose to remind the jury of its role in evaluating the evidence and to not be controlled by emotions but to review the evidence.[18] And given the overwhelming strength of the State's evidence in this case, we cannot say that such a strategy by Padilla's trial counsel would have been illogical or unreasonable. *Cf. Hathorn*, 848 S.W.2d at 118; *Jordan*, 859 S.W.2d at 421–22.

For this same reason, the overwhelming evidence of Padilla's guilt also renders Padilla unable to demonstrate that he was prejudiced by his trial counsel's closing argument. Padilla makes no attempt to show that, but for his trial counsel's closing argument, a reasonable probability exists that he would have been found not guilty. *See Strickland*, 466 U.S. at 694.

In fact, Padilla all but concedes that he was not prejudiced by trial counsel's closing argument, stating in his brief: "The pinnacle of ineffective assistance, in this case, occurred during closing argument. *While not the most damaging to the*

---

[18] For instance, trial counsel admonished the jury that "these cases are very emotional, extremely emotional" and that these types of cases can be dangerous "[b]ecause emotions usually close our eyes and we just go for it." Because of that, trial counsel reminded the jury to "read the Court's instructions" and to talk amongst themselves "and then decide on the evidence."

25

*[Padilla's] case*, it shows most clearly how trial counsel had abandoned her role as an advocate for the accused." (Emphasis added). Faced with C.F.'s testimony, Brother's eyewitness testimony of the assault, his 9-1-1 call, C.F.'s statements during her sexual assault examination, and the DNA evidence, we cannot conclude that a reasonable probability exists that he would have been found not guilty, even if trial counsel presented the closing argument urged by Padilla.

Without evidence of trial counsel's strategy for closing argument, and based on the overwhelming evidence of Padilla's guilt, we conclude that Padilla has failed to establish either that trial counsel's closing argument was deficient or that, but for this deficient performance, the result of the proceeding would have been different. Thus, he has failed to satisfy either prong of *Strickland*. *See* 466 U.S. at 694–98.

We overrule Padilla's sole issue.

## Conclusion

We therefore affirm the trial court's judgment in all things.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Landau and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).